## BURGER *vs.* HILL.

## *In the matter of proving the last will and Testament of* ALFRED HILL, *deceased.*

A will pronounced for,—contested on the ground of insufficient testamentary capacity.

Besides being satisfied as to the capacity of the decedent, it is for the Probate Court to determine, whether in performing the particular act in question, he had an intelligent understanding of the contents and effect of the instrument executed as a will.

Generally, the *animus testandi* is to be inferred from the act of signing and formal publication; but where the capacity is weakened or impaired, though not destroyed, and there is evidence of undue influence, fraud, imposition, or mistake, the presumption derived from formal execution, may be diminished or entirely overcome.

Where the decedent having sufficient testamentary capacity; but with his mind in a debilitated and prostrate condition, himself gave instructions, shortly previous to his death, to counsel called in to draw his will, in regard to its dispositions; and on directing the draftsman to give all his personal estate to E. P., and all his real estate to his mother and sisters, was asked·by his counsel, whether he had any real estate, and replied affirmatively, specifying his store in Greenwich Street, New-York, which was in fact leasehold estate :—Held that the will not correctly incorporating his testamentary intentions, it could be admitted to probate, only under a limited decree that it was a valid will of real and personal estate, except as to the said leasehold premises.

The Surrogate's decree as to the validity of a will of personal estate being conclusive, he must determine upon questions of error or *mistake,* as well as of fraud or incapacity, when they relate to the *factum* of the instrument. Courts of Equity have no jurisdiction to reform a will after it is admitted to probate, on the ground of *mistake* or fraud.

It is not competent for the Probate Court, under our present statute as to the execution of wills, to supply omissions by inserting words in the will; but part of a will may be established and part refused probate, if incapacity, fraud or imposition, be shown at the time of the execution of the latter part.

Where it is necessary to correct an error, to meet the intention of the decedent, probate may be limited as to particular assets.

WM. MULOCK *and* DAVID EVANS, *for the Executor.*
C. R. DISSOSWAY *and* A. CHILD, *for next of kin.*

THE following is a copy of the will propounded for probate :—

" The last will and testament of Alfred Hill, of the city of New-York.

" I, Alfred Hill, do make, publish and declare, this to be my last will and testament, as follows : I give, devise and bequeath unto my mother, Mary Hill, and my sisters, Caroline, Amanda, and Emily, all and singular my real estate of every description, and wheresoever situated, to have and to hold the same in equal proportions, share and share alike.

" And I do further give and bequeath unto Elizabeth Parker, of the city of New-York, the use and annual income of all and singular, my goods, chattels, moneys, bonds, notes, and personal property of every name and nature, during her natural life, and the said goods, chattels, moneys, bonds, notes and personal estate, after the decease of said Elizabeth, I give and bequeath unto Florence, the child of said Elizabeth, to have and to hold the same for ever.

" And I do hereby nominate and appoint my friend, William Burger, executor of this my last will and testament, and do hereby authorize and empower him, my said executor, to do and perform any and all act or acts necessary to carry into effect this my last will and testament.

" June 30, 1850.

his
" ALFRED + HILL. [L. S.]"
mark

*Witnesses*—

     A. BOCKES, residing at Saratoga Springs.

     JOHN L. PERRY, residing at Saratoga Springs.

The above instrument was now, at the date hereof, signed by the testator above named, in our presence, and he at the same time declared the above to be his last will and testament, and requested us, and each of us, to sign our names thereto as attesting witnesses, and we do, in the

presence of said testator, and in the presence of each other, sign the same as attesting witnesses.

A. BOCKES,
JOHN L. PERRY.

THE SURROGATE. The decedent, a resident of New-York, died during a temporary sojourn at Saratoga Springs. He made his will among strangers, and entirely removed from any influences or circumstances, tending to exercise an undue control over his mind. The will was drawn by an accurate and careful lawyer, was executed in conformity to the necessary legal requisites, with as much deliberation, as comported with the circumstances of the case, and shortly after its execution the decedent died.

The probate of the will is contested, on the ground of want of testamentary capacity and intention, at the time of its execution. The standard of capacity necessary to the performance of a valid testamentary act, is fixed by the law, in as precise terms as possible. Abstractly speaking, capacity or incapacity can, of necessity, be defined only by a general positive or negative expression; *soundness* or *unsoundness* of mind and memory. The judicial interpretation given to these terms, leads to the established proposition, that mere imbecility or weakness of understanding or memory, is not sufficient of itself, and apart from the particular act, to disable a person from disposing of his property by will; "if he be not totally deprived of reason, he is the lawful disposer of his property." (*Stewart's Ex.* vs. *Lispenard,* 26 *Wend.,* 255; *Blanchard* vs. *Nestle,* 3 *Denio.,* 37; *Clarke* vs. *Sawyer,* 2 *Comstock,* 498.) There is from the intrinsic difficulty of the subject dealt with,—the state and condition of the human mind,—frequent and great embarrassment in the application of this rule to particular cases. Perhaps no branch of judicial investigation requires so careful a consideration of facts, of the intelligence and opinions of witnesses, and the deductions to be drawn from human acts and conduct; and it often

occurs, very naturally, that different conclusions are attained by the most competent judges, upon the same state of circumstances.

But even when satisfied, that there existed sufficient general capacity to sustain a testamentary act, the adjudicating tribunal has frequently a difficult task remaining, to determine whether the weakness or infirmities of the decedent have exposed him to imposition; or whether in performing the particular act in question, he had an intelligent understanding of the contents and the effect of the instrument. As I have intimated, the idea of the decedent's being the subject of imposition or undue influence at the time of the execution of this will, is entirely excluded by the evidence. He was surrounded by strangers, and there was no one there who had any interest in controlling or influencing his testamentary acts, or who attempted to direct his mind in favor of any particular persons.

The will was drawn at his own request, and the instructions in regard to the dispositions proposed, given by him to the counsel who prepared the instrument. There can be no doubt of the decedent's general testamentary intention. He obviously meant to make *a* will, but whether he intended to make this particular will, whether his instructions were comprehended, whether they were correctly put in writing, whether when the will was read, he understood its contents, whether they conformed to his real wish, whether in fact *this* is his will, is to be determined only by a considerate examination of all the circumstances attending the transaction. Generally, the *animus testandi* is the natural and primary inference from the act of signing and formal publication. Formal execution is, as to this, the best, and in the majority of instances, the only testimony. But in proportion to the weakness of the intellect the force of this presumption diminishes, and where the decedent is imbecile, though not incapable, facts may appear tending entirely to destroy it. The *factum* of

a will, says Sir John Nicholl, "means not barely, the signing of it, and the formal publication or delivery, but proof in the language of the *condidit*, that he well knew and understood the contents thereof, and did give, will, dispose and do, in all things as in the said will contained." (*Zacharias* vs. *Collis*, 3 *Phill.*, 179.)   It may, for example, be shown, that a will, perfect as to attestation and execution, was made in *jest* (*Nichols* vs. *Nichols*, 2 *Phill.*, 180; *Trevelyan* vs. *Trevelyan*, 1 *Phill.*, 149); or that a person of imbecile or impaired capacity has been unduly influenced in making the entire will, or particular testamentary dispositions. " Where a person," says Sir Herbert Jenner, "is in the full possession of his intellect, the mere act of execution would lead to the inference, that he knew the contents of the instrument he signed; where the person is of a lower grade of capacity, owing to age or intemperance, a very different degree of proof is required to satisfy the Court, that the instrument contained the real intentions of the deceased." (*Parker* vs. *Loveland*, 2 *Curteis*, 225.)   Another illustration of this rule is afforded in respect to the wills of blind persons, the contents of which must be shown, to the satisfaction of the Court, to be conformable to the instructions and intentions of the deceased. (*Fincham* vs. *Edwards*, 3 *Curteis*, 63.)   The same may be said of the wills of persons unable to read.   Whilst fully admitting, therefore, that in general a knowledge of the contents of an instrument is presumed, from proof of the formalities of execution, I think it quite clear on the other hand, that when from weakness of capacity or other circumstances, the force of that presumption is diminished, it becomes competent and often necessary to inquire, how far in fact the will conforms to the intentions of the decedent.   Nothing is more common in such cases, than to receive proof of the instructions given by the deceased, his declarations, the position of his estate, his previous testamentary intentions, the condition of his family relations, the state of his affections, and a variety of other facts bearing upon the ascer-

tainment of the fact, whether the particular instrument conformed to the real intentions of the deceased. This is not admitting parol testimony to vary the will, but to ascertain whether it is really *the will* of the decedent; and in all cases, the *factum* of the will, of necessity, must be proved by parol. My meaning will be illustrated by a reference to the present case, the prominent facts of which are as follows:—

The decedent at the time of his death possessed an estate, consisting of his store in Greenwich Street, which was leasehold property, his stock in trade and other personalty amounting altogether in value, to about $20,000, and some real estate in Williamsburgh, valued at $3000 or $4000. His mother and sisters were poor, but respectable people, dependent upon their own exertions, and upon the profits of a small confectionary store in Bleecker Street, which he had purchased for them, the better to enable them to contribute by their labor toward their own support. There is no evidence as to the particular degree of intercourse between the deceased and this family, though it is possible, from the connection he had formed with Elizabeth Parker, named in this will, that their intimacy was not such as usually prevails between such near relations.

The connection between the decedent and Elizabeth Parker was illicit, and had been long continued. It was not only natural for him to make provision by will for the mother and child, who would otherwise have been left destitute ; but the criminal character of the ties which associated him with the mother, to say the least, certainly did not impair the moral obligation and duty of providing for his innocent offspring. Nor was it unreasonable for him to secure the comfort and welfare of the mother, after his decease, consistently with the natural claims of his own kin upon his bounty. It is apparent that such general intentions were present in his mind during his sickness, and led to anxiety in regard to a will. Mr. Lefevre, his intimate friend, whom he telegraphed to come from New-York,

says, that Mr. Hill " spoke to him about his will the day he arrived, that he had telegraphed him, as in case any accident happened, he was the man to whom he wished to make his will." On Sunday morning, Huling, his nurse, anticipating his speedy death, told him that.if he had any business to transact, he had better do it. According to Huling's statement, he said that he gave to his mother and sisters, his store and personal estate, and that he wished Elizabeth Parker to have all his real estate during her lifetime. Mr. Huling then advised him to have the will properly made, and Mr. Lefevre, who was out of the room, was sent for. On proceeding to Mr. Hill's apartment, he was informed by him, that he wanted to make his will. ﹒The words used by the decedent were, "I want to make my will; you know Elizabeth Parker?" Mr. Lefevre, after some conversation with him, proposed sending for a lawyer, so that the will might be regularly drawn and executed, but the decedent suggested a delay; his friend, however, sent for a professional person, and Judge Bockes was requested to attend and draw the will. On his arrival, which was about 20 minutes past 1 o'clock, the decedent requested all to leave the room except Huling, the nurse. He was then sitting in a chair. He informed the Judge, that he wished him to draw his will; and on being asked how it should be drawn, began thus : "I wish to give," or "want to give;" he then hesitated from what the Judge first supposed to be a difficulty of utterance, and addressing himself to Huling, who was supporting his head, said, "what did I call her," or "what did I say her name was?" Mr. Huling asked, "Do you mean the woman you spoke to me about, or Elizabeth Parker?" Hill replied "yes," and said he wished to give her, and her child, his personal estate, the use of it to her for life, and then to the child. The Judge asked him the name of the child, and he said it was Florence, and that the child was his. He then said, that he wished his real estate to go to his mother and sisters; the Judge asked him if in equal proportions; he re-

plied, yes. To ascertain if he understood the force of the terms he used, the Judge inquired if he had any real estate. He said the store, where he carried on business in New-York, he owned. While drawing the will in conformity to these directions, the Judge asked the names of his mother and sisters, which he gave. The will was then substantially drafted and engrossed, the decedent naming William Burger as his executor, after the draft was finished. While the will was being prepared, Dr. Perry came in, and he was removed to the bed. The will was then read over to him, distinctly and slowly, and the Judge inquired if it was as he wished it; the decedent answered, yes; and the Judge again inquiring if he understood its contents, he again replied affirmatively. The pen was then given to him, but finding that he could not use it, Judge Bockes asked if he wished to execute it by making a cross; he again said, yes; the Judge wrote his name and he made his mark. The attestation clause was read to him. The Judge informed him it was necessary to declare it to be his will, and to request him and Dr. Perry to become witnesses, and asked if he did so, and he replied that he did. The will was then witnessed; Mr. Lefevre came in, and Mr. Hill told the Judge to hand him the will, which was done. The decedent then said, it was a good or a beautiful day to die, and requested a clergyman to be sent for. This was immediately done, and the Rev. Mr. Chipp arrived in a few minutes, and within half an hour after, the decedent died.

In regard to the capacity of the deceased, the opinions of the witnesses are not uniform. Dr. Hamilton, who was called in on Saturday evening, pronounces him "idiotic," but he is not sustained by the judgment of others, nor by the facts from which he drew that sweeping inference. Mr. Huling thinks he was competent, Sunday morning, when the subject of making a will was introduced; and it is evident that as soon as the matter was spoken of, Lefevre was sent for, a lawyer summoned, and his attend-

ance procured with very slight delay. His statement, that from ten o'clock his mind became more weak, is not precisely consistent with the rest of his testimony on this point. Mr. Wilcox, who saw him between six and seven o'clock, says his mind was "weak and wandering," and Rev. Mr. Chipp, who visited him a few minutes after the will was executed, thought his mind was "weak and wandering," and that he had partially lost his consciousness. Mr. Lefevre says that he considered his mind sound when he first spoke of making a will, which, as I have shown, was but a short time before the will was drawn, and the two subscribing witnesses, one the physician, and the other a lawyer, both very competent judges according to the extent of their means of observation, express favorable opinions as to his capacity. The evidence of these witnesses, and the facts upon which they based their opinions, lead me to the conviction, that at the time of the execution of the will, the decedent possessed sufficient testamentary capacity to make a valid will. Undoubtedly his dissolution was near at hand; he was incapable of moving his limbs; his hand was nerveless, so that he could not write his name, and though his voice was distinct, he spoke with great difficulty. These, however, are all physical signs, in many cases the precursors of death, but not inconsistent with the exercise of mental faculties. The most marked facts as to his incapacity are his desire to be carried to New-York, and the wandering of his mind from one subject to another. But how often does it happen that one near his end is the very last to perceive the approach of death; how natural is the desire when laid on the bed of sickness to be carried home; and how unreasonable are the wishes when tormented by pain. And so also, how difficult is it in the midst of great bodily anguish to fix the attention, and if called away for the moment, how readily it reverts to the suffering body. Such circumstances are far from being controlling evidences of unsound mind, and it is necessary, therefore, to look further

in order to form a correct judgment. On the particular occasion in question, we find the decedent recollecting the names of his mother and sisters, and of Mr. Burger, his proposed executor, and of his illegitimate child, and after being reminded of it, the name of Elizabeth Parker; and when all was done, he remarked that it was a beautiful day on which to die, requested a clergyman to be called, designated the denomination, and after he came, though rapidly sinking, gave several tokens of intelligence. These facts indicate a condition of body and mind not difficult to comprehend—physical and mental prostration, loss of active and originating power, of attention and connected thought, with sufficient intelligence, however, when the faculties were aroused and fixed upon any particular point. To pronounce for a will made under such circumstances, requires satisfactory evidence that the draftsman has successfully elicited the real intentions of the party, has guarded against misapprehension, and secured upon all essential matters the necessary measure of intellectual action on the part of the decedent.

Let us see, then, how this is. The making a will appears from the first to have been the intention of the deceased. He spoke of it to his friend Lefevre, when he first saw him. And when the subject was renewed the day he died, both to Lefevre and Huling, as well as to Judge Bockes, he expressed his desire to provide for Elizabeth Parker and her child. Nor was he forgetful of his aged mother and his sisters, so that his intention to provide for all the persons named in the will is beyond a possible doubt. I was at first inclined to place stress upon the variation between the mode of disposing of his property, as stated by Huling from the conversation with Mr. Hill before Judge Bockes came, and that which the decedent adopted afterwards when the will was drawn. But Mr. Huling is doubtless mistaken in saying that the decedent told the Judge he wished the store in Greenwich street to go to Elizabeth Parker, and there is some confu-

47

sion in his mind on this point. He seems also to have prevaricated, out of Court, in relation to his opinion of the capacity of the deceased. Nor can the hesitation of Mr. Hill at the beginning of drawing the will, as to the name of Elizabeth Parker, be regarded as arising from uncertainty as to the person he intended, for he asked Huling, " What did I call her ?" referring to his previous conversation. This woman appears to have gone by his own name, a circumstance which in a measure accounts for his failure of memory in this respect. I am far from being satisfied that there was any variation as to the disposition of his property, from what the deceased intended earlier in the morning when he conversed with Huling. But if there was, it does not seem to have been caused by Huling's reminding him of the name of Elizabeth Parker in reply to his question, and is to be considered, therefore, as the act of his own mind. The great difficulty in this case arises out of another fact. The will, as executed, gives all the personal estate to Elizabeth Parker and her child, and all the real estate to his mother and sisters. The store is leasehold estate, and worth some ten thousand dollars, and yet it is plain the decedent designed to give it to his mother and sisters, supposing it, by a very natural mistake, to be real estate. Judge Bockes's testimony in this respect is very clear. He says, " his real estate he wished to give to his mother and sisters. I asked him if in equal proportions ? he said, yes. I then asked him if he had any real estate. My purpose was to see if he understood the force of the terms he had used. He said the store, where he carried on business in New-York, he owned, which was real estate. I then drew his will in conformity to these directions." The Judge again subsequently expresses himself on this point, in a way to preclude any doubt. He says, " I understood from the decedent that the store in New-York, where he did business, would pass to his mother and sisters under the term real estate, as used in the will. I asked him if he had any real estate. My

object was to see if he understood the force of the term, real estate, he used. He said he owned the store where he did business in New-York, and I believe he said, that was real estate which he wanted to give to his mother and sisters." Had the Judge written the will so as to give the store in terms to the mother and sisters, can there be a doubt that it would have been in consonance with the decedent's intentions? And yet if I admit the will to probate as it stands, the store which the decedent designed should go to his mother and sisters, supposing it was real estate and would pass under that term, will directly in the face of his intention pass as part of the personal estate to Elizabeth Parker and her child. And again, if I pronounce against the will in consequence of this mistake, the two latter for whom he was bound to provide,—a regard for whom was the moving cause of his making a will, and who were present in his mind as important objects of his bounty when he spoke of a will,—must be entirely cut off. A mistake has evidently occurred, and it is a most serious question how it can be remedied. If I admit the will to probate as it stands, and without qualification or limitation, this great error as to one half of the estate cannot, I think, ever be cured. The Surrogate has exclusive jurisdiction of the probate of a will of personalty, except in particular instances, where the power is conferred upon the Court of Chancery (2 *R. S.*, 3*d* ed., *p.* 126, § 46) ; and the probate is conclusive evidence of the validity of the will. (*Ibid.*, *p.* 121, § 21.) For this reason the Surrogate must of necessity determine all questions of fraud, imposition, undue influence, mistake, and other circumstances relating to the *factum* of the instrument. (*Clark* vs. *Fisher*, 1 *Paige*, 176 ; 2 *Bar. Ch. R.*, 412 ; *Colton* vs. *Ross*, 2 *Paige*, 398 ; *Muir* vs. *Leake & Watts Orphan House*, 3 *Barb. Ch. R.*, 477.) The consequence is where no ambiguity exists on the face of the will, or no equivocation or uncertainty as to the persons or the things intended arising out of the language of the will or extrinsic circumstances, parol

proof cannot be adduced in a Court of Equity after the will is proved, to vary its terms or purport. To admit such evidence would be to contradict, not to explain the will. The cases in which a Court of Construction will receive proof of this kind are ably reviewed, and the entire subject lucidly considered by Sir James Wigram in his treatise respecting the admission of extrinsic evidence in aid of the interpretation of wills. He lays down and establishes as the result of all the cases, several propositions, one of which is this; "that where there is nothing in the context of a will from which it is apparent that a testator has used the words in which he has expressed himself, in any other than their strict and primary sense, and where his words so interpreted are sensible with reference to extrinsic circumstances, it is an *inflexible* rule of construction, that the words of the will shall be interpreted in their strict and primary sense, and in no other, although they may be capable of some popular and secondary interpretation, and although the most conclusive evidence of intention to use them in such popular or secondary sense be tendered." Parol proof, therefore, cannot be produced in a Court of Construction to contradict a will (*Gardner* vs. *Heyer*, 2 *Paige*, 13), nor to correct a mistake (*Collins* vs. *Hoxie*, 9 *Paige*, 89), nor to show the intention of the testator, unless to apply the description in the will to one of several subjects or persons. (*Cromer* vs. *Pinckney*, 3 *Barb. Ch. R.*, 474.) The most ever done by a Court of Equity by way of relief, has been to hold a legatee who obtained a legacy to be made by fraud, as a trustee for the real parties intended or interested. (*Story's Eq.*, § 164; *Marriott* vs. *Marriott*, 1 *Stran.*, 666 ; *Segrave* vs. *Kirwan*, 1 *Beatt.*, 157.) But the general rule undoubtedly is, that mistakes and variances between the will as prepared, and the instructions given for preparing it, can only be reformed by the Court of Probate. (*Story's Eq.*, § 179 ; *Murray* vs. *Jones*, 2 *Ves. and Be.*, 318 ; *Newburgh* vs. *Newburgh*, 5 *Mad.*, 364; *Powell* vs. *Mouchett*, 6 *Madd.*, 216.)

In *Plume* vs. *Beale*, 1 *P. Wms.*, 388, the executor brought a bill in equity to be relieved against a particular legacy, alleging it had been interlined in the will by forgery. The Lord Chancellor dismissed the bill, on the ground that the will might have been proved in the Ecclesiastical Court, with a reservation as to that clause. It seems well settled, notwithstanding some early cases to the contrary, that a will cannot be set aside in equity on the ground of fraud (2 *Atk.* 324, 424; 3 *Atk.*, 17; 3 *Bro. P. C.*, 358; 2 *Cas. Temp.*, *Lee*, 363; 3 *Meriv.*, 161; *Jacob*, 466; 9 *Simon*, 539; 2 *Vern.*, 8); and the rule must, of course, be more stringent in a case of alleged mistake, or dispute as to the testator's intention.

If this will is admitted to probate, therefore, there is no remedy for the mistake in any other Court. This fact throws upon me the greater responsibility in determining whether or not the mistake can be corrected here.

Part of a will may be established, and part refused probate, if incapacity, fraud, or imposition be shown at the time of the execution of the latter part. (*Billinghurst* vs. *Vickers*, 1 *Phill.*, 187; *Wood* vs. *Wood*, *Ibid.*, 357; *Trimlestown* vs. *D'Alton*, 1 *Dow & Clark*, 85.) If a particular clause has been inserted by fraud, without the knowledge of the testator, probate will be granted with the reservation of that clause. (*Barton* vs. *Robins*, 3 *Phill.*, 455.) In such a case the will is engrossed without the clause, and so annexed to the probate. (1 *Phill.*, 187, 357.) In *The Goods of Shuttleworth*, 1 *Curteis*, 911, the solicitor who drew the will in the presence of the decedent, described the executor and universal legatee by a wrong name in the will, and probate was granted to the executor in his proper name, upon consent of the parties interested. In *Castell* vs. *Tagg*, 1 *Curt.*, 298, a legacy omitted by mistake in a will perfect on its face, was inserted in the will and made part thereof. The power to correct such errors has also been admitted in other instances. (*Shadbolt* vs. *Waugh*, 3 *Hagg.*, 570; 2 *Hagg.*, 537, 549; 1 *Hagg.*, 678;

3 *Phill.*, 434, 490 ; 3 *Add.*, 232.) Since the passage of the act of 1 *Victoria*, c. 26, prescribing the manner in which wills shall be executed, and which is similar in this respect to our own statute, the Court have very properly refused to supply a legacy omitted by mistake, the will being perfect, remarking that, " under the present statute, the Court cannot supply this omission." (*In The Goods of Joseph Wilson*, 2 *Curt.*, 853.) I cannot consequently insert any thing in this will, though it is competent for me to refuse probate to a part of it. The difficulty lies in this, that although the testator manifestly intended to bequeath his store to his mother and sisters, the legacy he has made to Elizabeth Parker being of all his personal estate, is so general in its terms, as to include the store. If probate is granted with the reservation of those words, " personal estate," the legatee may lose other personalty intended to be given ; if granted as it stands, she will take more than was intended to be given. The only way to meet this is to grant probate of the will as a valid will of personalty, except as to the store in question. The operation of the legacy of the " personal estate" will thereby be limited, and the store being undisposed of, will pass to the next of kin, the executor being charged with a trust in their favor, as in all other cases of a residue not bequeathed. The probate of wills made by married women under a power, has always been thus limited, and it has been the common practice of the English Courts to grant administration with or without the will annexed, limited as to time, purpose, or particular assets. (*In the Goods of Metcalfe*, 1 *Add.*, 343 ; *Howell* vs. *Metcalfe*, 2 *Add.*, 348, 351 ; *In the Goods of Campbell*, 2 *Hagg.*, 555.) Two administrations may subsist together where there is no executor, one limited to certain specific effects, and the other, general, and committed to another person. (*Wms. on Ex'rs*, 431 ; *McNairy* vs. *Bell*, 6 *Sayer*, 302.) And so the appointment of executors may be limited as to place, one being executor for one place, and another for another, or as to subject-matter, one being ex-

ecutor as to particular effects, and another as to other effects. ( *Wms. on Ex'rs*, 205 ; *Wentworth's Off. Ex.*, 29.) And it is laid down in Wentworth, that if a man makes a will, and appoints an executor for one particular thing only, he dies intestate as to the residue of his estate, and the probate is limited accordingly, while as to the residue, an *administratio cœterorum* is granted. ( *Went.* 30 ; *Toller*, 68.) The same rule applies to the property of married women, who have executed wills as to a portion thereof, under a power. The probate of the will is limited to the subject-matter of the power, and the husband will be entitled to a grant of administration *cœterorum*. (*Salmon* vs. *Hays*, 4 *Hagg.*, 388.) So also a man may make a will of personalty in one province and die intestate as to his goods in another, and in such case there is a limited probate, and also an administration. (*Godolphin*, *Pt.* 2, *c.* 30, § 5.) In the case now under consideration, there is an apparent difficulty in the way of this course, arising out of the fact that the appointment of the executor is not qualified, but general. By the rule of law, an executor by the mere force of his appointment, took all the undisposed of residue of the estate, and where his appointment was not limited, it involved an inconsistency, to pronounce the deceased to be intestate as to any part of the estate. (*Sutton* vs. *Smith*, 1 *Cas. Temp. Lee*, 275.) Since the act of 11 *George IV.*, *and* 1 *Wm. IV.*, in England, and in this State under the present and preceding statutes (2 *R. S.*, 3*d ed.*, *p.* 159, § 79), the executor, as to the residue not bequeathed, is, in fact, a trustee for the next of kin, who are entitled to distributive shares of such residue, as if the deceased had died intestate. In other words, as to such residue the deceased does, in fact, die intestate, except as to the mere nomination of the person to whom he intrusts the administration of his estate. If necessary, then, to the ends of justice, to decree a limited probate of a will, I see no substantial objection to the adoption of that course.

After much careful reflection, I feel satisfied, that great injustice will be done by rejecting this will, or by pronouncing in its favor as it stands. The evidence shows an earnest and anxious desire, to provide for the parties first named by the decedent, and though sorely pressed by pain and the distress of rapidly approaching death, though with mind wandering and attention fickle, he passed many of his last hours, yet while engaged in the serious task of providing for those he was about to leave, he seems to have acted with intelligence. Ordinarily, the proof of execution and of general capacity is sufficient. In this case, the decedent not only had the will read over to him before execution, but himself gave the instructions. It is true, he was mistaken as to the legal character of a valuable part of his property, supposing leasehold to be real estate; but this is an error by no means indicative of want of capacity, for it is very commonly made by unlearned men. The counsel who drew the will, was intelligent and careful, and seems to have discharged his responsible duties with vigilance and caution. Of course, in an instance of this kind, the Court will be more jealous in requiring proof, that the will is the free and spontaneous act of the party, that the deceased completely understood the dispositions, and that the instrument embodied such dispositions. (*Green* vs. *Skipworth*, 1 *Phill.*, 58; *Constable* vs. *Tufnell*, 4 *Hagg.*, 477; 3 *Knapp*, 123; *Jones* vs. *Godrich*, 9 *Jurist*, 314.) A candid consideration of all that transpired on the part of the decedent, at the time of making the will, leads me to the conclusion that he understood the disposition he proposed to make of his property, and that the will incorporates his testamentary intentions, except in the single particular I have already alluded to, which occurred by accident, and not from want of capacity. With this conviction, it is my duty to give effect to his last will, and I think that may be done, so as to render substantial justice to all parties, by admitting the will to probate, as a valid will of real and personal estate, except as to the leasehold

premises in Greenwich Street. Under such a limited probate, the testator's mother and sisters will take as next of kin, what they would have taken had the will conformed to his real intentions in that particular. Were I to direct probate, reserving the words "personal estate," in the clause giving a legacy to Elizabeth Parker and her child, the form of the decree might technically be more correct and in accordance with the English precedents; but that would be to forsake justice, for the sake of form; and under the condition of our law, which holds the executor as a trustee for the next of kin, in regard to a residue not bequeathed, it does not seem to me necessary to make such a departure from the decedent's instructions and testamentary intention. I am frank to say, this disposition of the case has not been arrived at, without a full sense of the difficulties which entangle the subject, but I believe it to be right in itself, and in consonance with a just and liberal interpretation of the principles by which testamentary Courts have been accustomed to be guided.

The following decree was entered :—

The citation in this matter having been duly issued, served and returned, such proceedings were thereupon had, that the proofs were duly taken, and after hearing counsel for all the parties appearing, and mature deliberation being thereupon had, it is decided, ordered, adjudged and decreed, that the instrument offered for probate in this matter is, and the same is hereby admitted to probate, as a valid will of the real and personal estate of the testator, except as to the legacies of the testator's "personal estate" therein mentioned, to Elizabeth Parker and her child Florence, which said legacies of said "personal estate," are admitted to probate as a part of said will, except as to the leasehold lot and premises of the said testator, known as number two hundred and eight Greenwich Street, in the

48

city of New-York, which premises are hereby reserved from the probate of so much of said will, as relates to said legacies of said " personal estate."

And it is further ordered, that the costs of all parties on the probate of said will and the Surrogate's fees, be paid out of said estate.