McSorley *vs.* McSorley.

*In the matter of proving the last will and testament of*
James McSorley, *deceased.*

The testator was a man of intemperate habits, and at times his conduct indicated signs of mental aberration. A will was prepared for him when in a state of insensibility, without any previous direction or knowledge,—during a temporary revival to a state of consciousness, its execution was not attempted—but on a relapse, it was engrossed, presented to him and read, and he was asked if it was right, and he answered, Yes. It was then executed, the decedent making affirmative answers to the formal questions put to him touching the testamentary declaration, &c. Held that under the circumstances and in the absence of any clear and satisfactory proof of instructions and intentions, probate must be denied.

Thos. L. Wells, *and* Wm. R. Stafford, *for Executor.*

I. The testator had testamentary capacity.

1. His habit of drinking had not destroyed or impaired his capacity to do business or execute a will. The law presumes him capable till the contrary is made out. The opposing witnesses testify to no *facts* showing loss of mind. They give their opinions only, formed from occasional conversations and eccentric behavior. (2 *R. S., p.* 2, § 1 ; 5 *J. R.*, 144; *Jackson v. King*, 4 *Cowen*, 207; 26 *Wend.*, 293, *ib.* 317 ; 21 *Wend.*, 142 ; 24 *Wend.*, 85.

The testimony in favor of his capacity is supported by facts, and the opposing witnesses corroborate it by proving business transactions and conversations with him, as a man of sound mind.

The opinions of witnesses as to mental capacity, unaccompanied by *facts* and circumstances to support such opinion, are entitled to very little weight. (26 *Wend.*, 291, 309, 298.)

2. His mind was sound and clear, and he was calm and collected when he executed the will. There is no evidence that he exhibited any loss of mind during the last week of his life ; on the contrary, the majority of the witnesses show that he had recovered from his attack, and fully understood what was transpiring around him.

II. The will was executed with all the formalities required by law.

III. The will was drawn according to his directions, freely expressed to the witnesses, McIntosh, Caldwell, Mrs. McAdorey and McCann, and afterwards reiterated to Stafford.

IV. There is no proof of undue influence. There was

no importunity on the part of his wife, or by any person on her behalf. There was no deception or concealment in preparing and executing the will. It was done openly in the day, and where many persons were continually coming and going. It was in conformity with his previous arrangements, and with his own expressed wishes.

There was no fraud practised *to obtain the will.* No art or effort was used to prevent his friends and relatives having free access to him during his illness. The subscribing witnesses had no interest in his estate, and can neither gain nor lose by the result of this matter.

V. The will was a reasonable and fair disposition of his property.

That property was acquired by the joint efforts of his wife and himself.

He had no immediate relatives except his brother, residing in Pennsylvania, and cousin, Thomas McSorley, of the Eighth-avenue, the contestants, with both of whom he was on unfriendly terms, and whose comfortable circumstances did not require his bounty. The will furnishes no reasonable ground of complaint that he preferred his wife to relations with whom he had no friendly intercourse, and to whom he owed no obligations. (*Brown v. Betts,* 9 *Cowen,* 208 ; 2 *Hill,* 569, *Germond* vs. *Jones.*)

T. J. GLOVER, *for next of kin and heirs.*

THE SURROGATE. The will propounded for probate, gives all the estate of the deceased, real and personal, to his wife, Catharine McSorley. He left no children surviving, and his heirs-at-law and next of kin consist of a brother, a sister, and the children of a deceased sister. During the pendency of the present contest, the widow has died, leaving a will disposing of her property, which has been duly proved.

The contestants have endeavored to establish James McSorley's incompetency to make a will. I will consider that evidence after having first adverted to the circumstances attending the execution of the instrument under consideration. On Thursday, the first of May, about noon, the decedent was taken with a fit, and was carried to his bed insensible; on Saturday, the 10th May, about 5 or 6 o'clock in the afternoon, the will was executed, and on Tuesday, May 13th, he died. On Friday, the 2nd of May, whilst he lay in a state of insensibility, a will was prepared for execution, by his counsel, but no attempt was made to have it signed. The instrument was left with Mrs. McSorley, with directions as to the mode of execution, in case her husband should revive so as to be able to make his will.— The evidence shows that in the ensuing week he so far recovered as to get up, with assistance, and to converse with his family and friends. He then relapsed, his counsel was sent for, and the will executed. Mr. Stafford gives the following narrative of the transaction. He states that on the 2nd of May, he went to McSorley's house " to get him to make an affidavit," and learned that he had had a fit and fallen from the stoop on some stones. He found him insensible. McIntosh and McCann, friends of McSorley, were there. The former introduced the subject of a will, saying there ought to be one drawn and ready; " the child was dead, and it was better to have the matter fixed. McCann was present and also alluded to it. I asked them both how the will had better be drawn, and they said there had been a will, and the property was left to his wife and child, and the child was dead; and I got the impression from what they said, that he wished, after his debts were paid, his wife should have his property." " I asked McCann, who had better be named as executors. I think he told me a Mr. Harrison and Mr. McIntosh had been executors in some old will. I drew my own conclusions about who were the proper persons, and left out Harrison. McIntosh did not want to be executor. He told me he would not

be executor. That was when I saw him afterwards, for he had gone away that night before I had finished drawing the will." After drawing the will, Mr. Stafford left it with Mrs. McSorley, giving her directions how it should be executed in case the decedent " came to his senses." He also states that when he drew the will, he was under the impression the decedent ".had no immediate relatives," an impression probably derived from nothing being said on that subject. He adds, " After drawing the will and leaving the house, I was walking down to the stage with McCann, and he asked me how I had drawn the will. I told him. He said it was not right. He had a brother in Western New York. It ought to be altered." " He said it was not right, his brother ought to have something. That was the first I heard he had a brother. I said, if he came to his senses he could have it explained to him, and I would draw another if they wished it." A day or two after, Mr. Stafford heard that McSorley was better, but nothing appears to have been done till the 10th of May. He says, in the afternoon of that day, McCann came to his office, bringing with him, as he thinks, the will previously drawn, and told him McSorley " was much worse, and they did not think he would live ;" that he was "wanted up there right away." He inquired whether any alterations were to be made, and on being answered in the negative, asked why the will he had left had not been executed. McCann replied they would rather have him there " to see it was all right." McCann, at that time, also requested him to draw an agreement to be executed by McSorley, relative to a building he had erected on some premises leased by him of the decedent. Mr. Stafford says, " I knew of the agreement verbally before, and he wanted to know if I would not get it done when I went. ' He stated what the agreement was." After the will and the agreement were prepared, Mr. Stafford, as soon as possible, got in a stage, rode to the residence of the deceased, and was at once taken into the back room where he was lying in bed." He says,

" I found him, a very sick man indeed, very weak;" " he looked very pale, just on the point of death, and as if he was rapidly declining;" " his bodily condition appeared to be that of a man approaching dissolution. He lay very quiet; did not seem to be in any pain; his eyes were open. He appeared to be calm, conscious and self-possessed." " I thought his state of calmness was owing to the near approach of death. This was when I went in." " He appeared to recognise me, by attending to my conversation." " When I went in, his wife or McCann, told him Mr. Stafford had come, and then I went up to him and shook hands with him; said I was very sorry to see he was so bad, and asked if he knew me. He said, ' Yes you are the boy.' I said, I had been there before, but he was too bad to see me. He said, ' Yes, they told me so.' He then said he was glad to see me." " I said he had met with a very bad accident. He replied, ' Yes, it was very bad,' or ' Yes, it is pretty bad.'" " I told him I had brought a will up, and asked him if it was his desire to make a will, and he said, Yes." " I said, ' I am told you want your debts paid first, and the rest to go to your wife.' He said, Yes. I then told him I had the will that way, and would read it to him." Mr. Stafford then read the will to him, by sections, asking him at each, if that was right; to which the decedent answered, " Yes," three times. He then read the whole will, and asked him if he would sign it.— He said, " Yes." He was then supported in the bed; the pen put in his hand; he attempted to write; said " I can't write;" was asked if he would make his mark, and said, " Yes." Mr. Stafford inquired whether he should write his name, he answered, " Yes." He then made his mark—Mr. Stafford supporting his arm just above the wrist. Both before and after he put his mark, Mr. Stafford asked him whether he signed, sealed, published and declared the instrument to be his last will and testament, and requested them to become subscribing witnesses. He answered, " Yes." Stafford, McCann and Philip McSorley, then

13

signed; the attestation clause was altered; Stafford returned to the bed, and went through the same forms as before, and he replied, "Yes." Next, the agreement with McCann was executed. Stafford says, "I read it to Mr. McSorley and explained it to him, as I had previously done to his wife, and I asked him if that was the proper document, and he replied, Yes, that was the agreement—that was it. Both he and his wife said so. He and his wife talked about it while I was there. He said he agreed with her, and then I read the document to him." After this, the decedent had a newspaper in his hand, and read part of the title of it: "The New York." It was the Herald. Mr. Stafford adds, "I never saw him more reasonable." "I was surprised to find him so calm, reasonable and collected. I don't know that I ever saw him more so, or when he appeared to understand better what was going on."

It thus appears, that the will of the decedent was prepared without his instructions, at the suggestion of friends, when he was totally insensible; that on a partial recovery no effort was made to effect its execution; and on a relapse, when, according to the statement of one of the subscribing witnesses, "he was much worse, and not expected to live," and as expressed by Mr. Stafford, he looked "just on the point of death," the instrument made by others, on his first attack, and now engrossed without alteration, is presented to him, and he is asked a series of questions, to which he answers, "Yes," "Yes," *toties quoties*, as often as the inquiries are put. "If," says the Touchstone, "some friends of a sick man, of their own heads, shall make a will, and bring it to a man in extremity of sickness, and read it to him, and ask him whether this shall be his will, and he say yea, 　 ＊　 ＊ the testament is very suspicious." There must, then, be some proof to remove this doubt or suspicion—something, beyond the mere acquiescence of a sick man *in extremis*, to indicate that it was his will, that it conformed to his intention and wishes, that it was an active and not a passive will,

that it was not the act of others and his submission, but his own act.

I have thus far only considered the facts furnished by Mr. Stafford, the most intelligent of the three subscribing witnesses, and who, probably, recollected the circumstances more accurately than the others. Philip McSorley, one of the other witnesses, states that he did not hear the decedent say anything at the time of execution, but that he only bowed his head when asked by Mr. Stafford if he was satisfied that should be his last will. He adds, that he read a few words from the newspaper; and then says, "I cannot say that James had sufficient mind and understanding, to know that he was making his will and disposing of his property after his death."

McCann, the other witness to the execution, states that McSorley's "mind was very good." As he procured at that time, the execution of a document which, if valid, secured to him very important rights, and as the fate of the will and that instrument are indissolubly bound together, it is manifest he is not a very disinterested witness.— Many of his statements are contradicted by Mr. Stafford. He states, that on the 2d or 3d of May, he went, at Mrs. McSorley's request, to Stafford's office, and asked him to come up and draw a will. Mr. Stafford says, he went to McSorley's house that afternoon, on other business, not having heard of the accident. McCann said, there was no will drawn that afternoon, to his knowledge—that he does not think one was written—that he did not leave the house that evening with Mr. Stafford, and did not then, or at any other time, tell him it was not right his wife should have all the property, and that he had a brother, who ought to have something. Stafford says, that he left in company with McCann, and told him how he had drawn the will; and McCann said that was not right, his brother ought to have something. McCann said, that on the 10th of May he did not see any will already drawn at Mr. Stafford's office, and, although he had previously testified that he did not know

how it was drawn, subsequently stated that he gave the directions. Mr. Stafford stated that McCann brought the will drawn by him on the 2d day of May, to his office, and on being asked whether any alterations were to be made, answered in the negative. It is useless to follow this witness through his tortuous testimony; but it is enough to say, that he differs on so many points from the statements of Mr. Stafford, as to leave the latter the only reliable authority for the facts attending the preparation and execution of the will.

So far, it is apparent that the will did not emanate originally from the deceased. McCann, however, states that on the morning of the 10th of May, he was sent for by Mrs. McSorley, who thought her husband was getting worse. He went. "His wife asked him if he would not settle his affairs. He said he wished they were settled. She asked in what way he wished to have them settled.— He said, First pay my debts, and the remainder will be yours."   *   *   "She asked him if I should go for Mr. Stafford; he said, Yes: that was all, and then I left."

Mrs. Ellen McSorley testifies that on Friday, the preceding day, his wife "wanted him to make a will," and she adds, "So did I too, as well as she. She said that to him more than once. He said he did not want to make a will; that he had never wanted to make a will. I wanted him to get the old will and make a new one. He said, No, he did not want to make any will at all."   *   *   "That it was quite different with him now, when his child was dead; that he wanted no will." This statement is uncontradicted, though the witness names two persons who were present at the conversation.

I have not overlooked, in this connection, the evidence of Caldwell, Mrs. McAdorey and McIntosh. Caldwell says, six months before his death McSorley told him he would make a will similar to his first will. Mrs. McAdorey states that in the morning of the 10th of May, he said he was going to have his affairs arranged. McIntosh testifies, that

two or three days before his death, McSorley stated to him that he wished his debts paid, and his wife to have the remainder. He puts this interview at the time he first heard he was sick, and says he did not see Stafford and McCann there; and yet it is proved that on the second of May, he met McCann and Stafford at McSorley's house, eight days before the will was executed. I see no satisfactory proof of McSorley's testamentary intentions, in the evidence of these witnesses.

There are many other facts contained in the voluminous mass of testimony before me, by no means immaterial, and yet hardly of sufficient importance in the view I take of the case, to need comment. The general features of the transaction, are these :—The execution is sustained by one reliable witness only, and the facts, as stated by him, show mere passive acquiescence, and not any will or active intelligence. The probability is, that with the familiar countenances of his wife, his friend McCann, and his counsel, the testator would have signed any paper presented to him. The agreement signed for McCann, by which he bound himself to pay for buildings on leasehold premises, for which McCann had not a shadow of legal title, might as well have been a deed of all his property—or the will might as well have made another disposition of his estate—for aught that he directed. He was asked if he would do this, and he said yes—and if that was right, and he said yes; and so it went on through the entire ceremony.

Now, such a transaction might possibly be supported by testimony of instructions and intentions, but there is not only no reliable proof of such, but there is evidence uncontradicted, that the day before, when he was not so ill, he refused to listen to the importunity of his wife, who urged him to make a will.

In the case, then, of a man who, when in health, had been of sound mind and good habits, a will prepared and executed *in extremis*, under the circumstances attending this, would not be deemed validly executed. His mere ac-

quiescence, when in a dying state, almost speechless, able only to respond by saying yes, or a few words more, fast failing, and a few hours afterwards become insensible— would not be sufficient to establish a will concocted wholly by others without his privity, brought to him ready drawn, and passed through the statutory ceremonials by questions and answers—answers that might have been made by a child.

But when, in addition to this, we find that McSorley, when in health, was not a man of good habits or of a well regulated mind—and that if the testamentary act in question, instead of being consummated on his death-bed, had been performed when in his ordinary state of health, it would still have been a question of grave doubt whether he was competent to perform it,—I think there should be no hesitation in rejecting this will.

Without entering into details, or touching upon controverted points, the following facts seem abundantly established.

He was a man of grossly intemperate habits, which grew upon him until they had reached such a height, that he would rise oftentimes at night, leave his bed, and go down stairs to drink. Whether from original weakness of mind, increased by intemperance, or from the latter cause alone, he at times indicated numerous symptoms of mental disorder. It is in proof, that on various occasions he behaved in the most violent and irrational manner. He whistled, shouted, wagged his head, cut extraordinary capers, whirled a staff round his head, turned somersets, paraded his shop, and marched in the street with a broom or a codfish trimmed with ribbons, strung across his shoulders, going through martial exercises. On meeting friends in the street, he tossed up his hat, flourished his stick, and knocked off their hats. He had a keg of powder in his store, and would lay a train along the counter and fire it off. He would fire off his gun at all hours of the night, in the house or in the street. His language was absurd, fool-

ish, rambling and incoherent.  He was found late at night in the street, some distance from home, without hat or coat, howling or yelling, and was taken home several times by the police.  There was much testimony heard on this subject, but I do not think it material to recapitulate it.— Many witnesses were also sworn to establish a rational state of mind and competency to transact business and make a testamentary disposition of his property.  Taking the whole testimony together, the result seems to be, that while at times he was capable of making a bargain or protecting his interests, at others he was a madman.  His intemperate habits were undoubtedly connected with these changes, his violent and insane conduct being occasioned either by gross excess, or as often happens, by occasional abstinence. It is enough to say, however, that if such a man was capable of making a rational will, the fact that at the time of the testamentary act, he was in the full possession of the little reason he ordinarily had, must be incontrovertibly established, and the will itself must be shown to be an active, and not a passive performance—to have been directed by him and to have been in conformity to his wishes and intentions.  Nothing of this kind satisfactorily appears.— In his best estate, his capacity was doubtful ; the will, prepared when he was insensible, was not presented when he had partially revived from his first attack, and was only brought to him as he was relapsing into unconsciousness. Under all the circumstances, therefore, I think justice requires that the instrument should be refused probate.