KINGS COUNTY—HON. JESSE C. SMITH, SURROGATE—September, 1854.

## TURHUNE v. BROOKFIELD.

*In the Matter of the probate of the Last Will and Testament of* JAMES MALCOLM, *deceased.*

A legatee under a will made prior to the one offered for probate, who is neither an heir-at-law nor next of kin of the deceased, may intervene to oppose the probate of the subsequent will.

Where suspicions of undue influence are created by reason of the advanced age, blindness, and imbecility of the testator,—*Held*, that a presumption is raised against the will, which requires that they be removed by clear and satisfactory evidence, beyond the mere fact of the existence of the will and the capability of the testator.

*Held, further*, that such presumption is satisfactorily removed by proof of the instructions given by the testator in regard to the drawing of his will; that the same was carefully read and explained to him at the time of its execution; and that he subsequently declared every thing was arranged to his satisfaction.

J. H. & H. L. RIKER, *for executors.*

SANDFORD & BILLINGS, *for Ann Titlar, in support of the will.*

JOHN A. LOTT, *for Hannah Brookfield, in opposition.*

THE SURROGATE.—Upon the return of the citation, Hannah Brookfield appeared by her counsel and claimed the right to intervene and oppose the probate of the will, on the ground that she was a legatee under a former will, as well as under the one now offered for probate. Upon the production of the former will, and the proof that it was executed by the testator in the form prescribed by law, the legatee has sufficient interest to entitle her to intervene and to oppose the probate of the will offered.

[The learned surrogate proceeded to discuss the competency of a witness, who was objected to at the trial, on the part of the executors, on the ground of interest. As the late amendments of section 399 of the Code of Procedure have removed,

in great part, the disability of witnesses on the ground of interest, it is deemed advisable to omit that part of the surrogate's decision.]

I do not understand the counsel in opposition to the will offered for probate, to contend that the testimony in this case shows affirmatively that the testator was incompetent to make a will at the time when the instrument offered for probate was executed. But he insists that the testator was incompetent at the time he left the house of Mr. Hick to go to Mrs. Titlar's; that he was close and penurious; that he was placed in a condition where Mrs. Titlar and her friends could exercise an unlawful control over the testator; and that the facts in evidence show that undue influence was exercised, so that the will offered for probate was not the free and unrestrained act of the testator.

Proof of the due execution and publication of a will is presumptive evidence that the testator knows the contents of it. (1 *Jarm. on Wills,* ed. of 1849, 47.) It is also held, that though the factum be proved and the testator be capable, yet circumstances will be sufficient to create a case of suspicion, and warrant a presumption against the will, so as to require that the presumption be removed by clear and satisfactory evidence, beyond the mere fact of the existence of the instrument. ( *Von Slentz* v. *Comyn,* 12 *Irish Eq. R.,* 622.)

The testator being blind, or nearly so, besides the proof of execution and publication, it is incumbent on the propounders of the will, in some way, to show to the satisfaction of the court that the testator knew the contents of the instrument offered for probate, and was not imposed upon.

To make the application of the facts in this case to these rules of law, and to come to a correct conclusion whether the testator understood the contents of the paper offered for probate, and whether he executed the same as his own free and unrestrained act, it will be necessary to inquire,

*First.* Whether the testator, at the time he executed that paper on the 29th of June, 1853, had sufficient capacity to make a will; and

*Second.* Whether an undue influence was exercised on him, so that the instrument offered is not his will.

In regard to the question of capacity, I shall not go over the testimony on that point, but it seems to me that the evidence of the subscribing witnesses to the will, together with that of Dr. Donne and the other witnesses in support of the will, greatly outweighs that of the witnesses produced in opposition to the will. Besides this, the witnesses offered in support of the will on that point are entitled to greater consideration than the majority of witnesses called to show a want of capacity, for the reason that the former have no pecuniary interest, immediately or remote, in the result of the question at issue, while the latter have most of them an interest in the question, which, though it does not legally disqualify them on the ground of interest in the immediate result, may nevertheless be very properly taken into account as going to their credit. I cannot doubt, that if the only question in the case was a question of capacity, the testator was, on the 29th of June, 1853, possessed of sufficient mind, memory, and understanding, to make and execute a valid will.

But upon the question of capacity, as connected with that of influence, it appears that the testator was an aged man, laboring under the infirmities of disease and of blindness; suffering from bereavement from the loss of his second wife; without family or next of kin; left to seek a home among the connections of his two deceased wives; and though independent in regard to his condition in life, yet he was dependent to a large extent upon those around him for enjoyment.

Under these circumstances, it is quite natural that a will made by the deceased should partake to a greater or less degree of the character of the influences surrounding him at the time of its execution. That the condition of the mind of the testator was such, that during the last nine months of his life he was subject to a greater or less extent to such influences, is apparent from the character and contents of the codicil of February 17th, 1853, and of the will offered for

probate. In the examination of this case, it will be borne in mind that the deceased, after the death of his wife, had no family, no relations, nor next of kin for whom he was bound to provide. The relatives of his two wives, who are the legatees and devisees under his will, had no legal claim upon his estate, and the provision for them is voluntary.

If, therefore, the testator has preferred one of these families to the other, or any member of either family to others of the same family, no argument can be drawn from the act itself that it is contrary to the natural affections or to the legal obligations of the testator.

The first will, which was executed immediately after the death of his last wife, after giving specific legacies to the amount of $2,200, divided the residue equally between the families or relatives of his two wives. It appears that the testator, at the time that he made the first will, was about to leave the city of New York and to take up his residence with Mr. Brookfield, at Morristown. Mrs. Titlar said he should not go until he made his will, and he did not go until he made it. This circumstance is claimed by the counsel in opposition to the will, to be the main starting-point in the evidence of undue influence on the part of Mrs. Titlar over the testator. That will was drawn by John H. Riker, Esq., who was sent for by Mrs. Titlar. Yet the person sent was Joseph D. Bonsall, a member of the family of the last wife of the testator, whose interest was opposed to that of Mrs. Titlar, and the will itself furnishes no evidence of undue influence on the part of Mrs. Titlar, as it gives her only $100, and was made while some of the members of both families were present at the house of the testator. Upon the return of the testator to the city of New York, at the house of Mr. Hick, feeling the loneliness of his situation, he consented to have an operation upon his eyes, for a cataract; with a hope, if possible, to restore his sight so as to enable him to read. After the operation upon his eyes, he appears to have desired to make some alteration in his will. The will was sent for, and Mr. Riker, his counsel, requested to call and take instruc-

tions to draw the alterations. His counsel advised him to wait until he got over the excitement occasioned by the operation on his eyes. But the testator being impatient to execute the codicil, sent for Mr. Disosway, the counsel of Jonathan Hick, and had a codicil drawn, which was executed. By this codicil an important change was made in the disposition of the property of the testator. Nearly one-quarter of the estate was taken from Peter Titlar and Ann Titlar, a brother and sister of his first wife, and transferred to the Hick family; thus giving to that family nearly three-fourths of the entire estate of the testator.

It is not strange, after the knowledge of the contents of this codicil came to the ears of the members of the Titlar family, that they should have been desirous to bring the testator into a position where he might reconsider his bounties, and dispense them with a different hand.

A plan was accordingly set on foot by Mrs. Titlar and her friends, Messrs. Turhune and Hope, who were also old and tried associates of the testator, to get this aged and somewhat infirm man away from the house of Hick, and to have him under the shelter of the roof of the Titlars. After some negotiations and personal interviews between these old friends, this object was accomplished; and the deceased was, on the 8th of June, 1853, safely within the walls of the house of Mrs. Titlar, in Williamsburgh. I speak of these matters as facts appearing in evidence in this case. Whether the motives which induced the change of residence was the desire to make the old man contented and more comfortable in his last days, or the more sordid wish to get him within the influence of that branch of the family, so as to bring about an alteration in his will, it is not so material to inquire, as it is to learn whether the change of residence, with other appliances, had the effect to produce such an influence over the mind of this old man, that the will which he made on the 28th of June, 1853, was not his will, but that of Mrs. Titlar and her friends.

In regard to the contents of this last will, the specific lega-

cies are increased from $2,200 to about $11,800, including the value of the house and lot devised to Mrs. Titlar, so that the residuary estate is much less than it was under the first will, or under the first will and codicil. This residuum being divided into eighteen parts, and eight given to the Titlar family and ten to the Hick family, the final result is, that the Titlars' receive between $26,000 and $27,000, and the Hicks' between $21,000 and $22,000. Now it is more than probable that the deceased was influenced by Mrs. Titlar and her friends to make this last will more decidedly in her favor than the first will, or the first will and codicil. But the question to be decided, is, whether there is evidence sufficient to show an undue influence so as to vitiate the will.

"It is not unlawful for a person by honest intercession and persuasion to procure a will in favor of himself or another person, neither is it, to induce the testator by fair and flattering speeches; for though persuasion may be employed to influence the dispositions in a will, this does not amount to influence in the legal sense. And whether or not a capricious partiality has been shown, the court will not inquire." (1 *Jarm. on Wills*, 37.)

It will be seen by an examination of the contents of the first and last wills, that although by the first will seven members of the Hick family were to receive over $800 each more than they would receive under the last will, yet the aggregate amount given to the Hick family by the last will is only some $2,600 or $2,700 less than the aggregate amount given to that family by the first will. And that the gross amount given to the Titlar family under the last will is but a little over $2,000 more than was given to the same family under the first will. This near approximation to equality between the two families is brought about mainly by giving to the executors $500, and to the children of John Bonsall over $3,000 additional legacies.

It is said that the change in the last will, giving to Mrs. Titlar the legacy of $2,000 in place of $100 in the first will, and the devise of the house and lot in Allen-street to her, is

evidence that the testator was acting under undue influence, exercised by Mrs. Titlar over the testator while he was under her roof. Such a change Mrs. Titlar was undoubtedly interested in and sought to bring about. But there is another material change in the last will, in giving to the children of John Bonsall the additional $3,000 in which she had no interest. It does not appear that either Mrs. Titlar or her friends had any wish or desire that this last change should be made, or that they took any concern in the distribution of that portion of the property of the deceased which was to go to the different members of the Hick and Bonsall families. The reason why the shares of the residuary estate of the deceased were taken from Ann and Peter Titlar, both in the codicil and in the last will, appears from the declaration of the testator that he did not consider himself under any obligations to them; and the reason why he makes the devise of the house and lot in Allen-street to Mrs. Titlar, in the last will, is stated in the will itself, that he expected to pass the residue of his life under the care and attention of Mrs. Titlar. He gave the specific legacies of $250 to the child and grandchild of Reuben Hope, probably at the request of his old friend and partner, Reuben Hope, for whom he desired, if necessary, to make some provision in his will, and to whom he sent to inquire how it fared with him in the world. It is not apparent why the specific legacies of $500 in the codicil and last will to Francis Kirk, and of $500 in the last will to Harriet Wild, were inserted; nor why the radical change was made in favor of the children of John Bonsall. Neither is there any explanation why, in the last will, the residuary estate is first divided into eighteen parts, and then distributed in unequal portions; the largest portion having been given to the Hick family.

If, however, the testator was competent to make a will, and has made it without improper influence, it is not necessary to inquire the reason why he made this or that provision.

His will stands as a reason for his acts. But the facts appearing from the will of the change in favor of John Bon-

sall's children, and of the division of the residuary estate so
entirely different from the former will and codicil, and yet
so as nearly to restore the equilibrium between the Hick and
Titlar families, in the absence of any proof whatever that
these changes were brought about or induced by any person
interested for either family, goes far to show that the instru-
ment offered for probate is the last will and testament of the
testator, rather than that of Mrs. Titlar and her friends, who
were charged with the getting up and making of this will.

The case of *McSorley* v. *McSorley* (2 *Bradf.*, 188) was a
very different case from the one under consideration. In
that case, the will was prepared without instructions, at the
suggestion of friends, when the testator was totally insensible.
On a partial recovery no effort was made to effect its execu-
tion ; and, on a relapse, " when he was much worse and not
expected to live, and was just on the point of death," it was ex-
ecuted without his being able to say any thing more than "yes,"
to the questions put to him on its execution. The surrogate
held, that, under these circumstances, and in the absence of
any clear and satisfactory proof of *instructions* and *intentions*,
probate must be denied. And in summing up the evidence,
at pages 198 and 199, he shows that the character of the
mind of the deceased was greatly inferior to that of the testa-
tor James Malcolm.

In this case, the deliberation with which the instructions were
given to Mr. Riker, who drew the will, and the care which
was taken by him to read and explain the will to the testa-
tor, show an entirely different state of facts from the case of
*McSorley* v. *McSorley*, and present affirmative proof to rebut
any presumptions arising from the condition of the testator
as to his health, his imbecility of mind, and to surrounding
influences.

In the case of *Mowry* v. *Silber* (2 *Bradf.*, 133), cited by
counsel in opposition to the will, the counsel who drew the
will, and was also a subscribing witness to it, was compara-
tively a stranger to the deceased. He took his instructions
from him, and thought him competent. The will gave to a

daughter, with whom the deceased was residing at Newark, nearly one-half of the estate of deceased, to the exclusion of other children. This was shown to be contrary to his former intentions, and no satisfactory evidence was given to show that, in his weak condition of mind, he was not unduly biassed or influenced to the performance of an act discordant with his previous intentions. In the case under consideration, as I have before stated, the testator had no children or next of kin that he was bound to provide for. He had not expressed his determination to do otherwise than he did, by his last will, except that in his first will he declared his intention to divide the body of his estate equally between the relatives of his two wives. I have shown how nearly this intention is carried out in the last will, by the change in the division of the residuary estate, and the additional legacies to the children of John Bonsall. Besides this, the will in this case was drawn by counsel intimately acquainted with the deceased, who had transacted his business for thirty years, who knew well his character and the state of his mind; and who testifies, with great clearness and with decided knowledge, that the testator was not only of sufficient ability to make a will, but that he perfectly understood the contents and executed the same freely and without restraint. In both the other cases cited by counsel in opposition to the will, to show the rule of law to be that, when suspicion is excited, it is incumbent on the propounder to show affirmatively that the deceased acted with intelligence and comprehended the effect of what he was doing, the wills offered for probate were sustained,— *Burger* v. *Hill* (1 *Bradf.*, 360), and *Moore* v. *Moore* (2 *Id.*, 261). And certainly if the surrogate found sufficient testimony in those two cases to remove the presumption, I can have no hesitation in this matter.

In the case of *Barry* v. *Butlin* (2 *Moore's Cases*, 480), the will was drawn by a person interested, and the testator was of doubtful capacity; the will cut off the only son of the testator, and yet it was sustained. Baron PARKE says: "We think, therefore, on the whole, that the evidence of the factum,

coupled with the strong probabilities of the case, is sufficient to remove the suspicions which naturally belong to the case of all wills prepared by persons in their own favor, especially when made by those of weak capacity. The undue influence, and the importunity which, if they are to defeat a will, must be of the nature of fraud or duress, exercised on a mind in a state of debility, are insinuated, but not proved."

In the case of *Von Stentz* v. *Comyn* (12 *Irish Eq. R.*, 622), the will cut off sons and gave to a daughter. It was drawn in Vienna, while the daughter was present and the sons absent. The husband of the daughter of the deceased was the executor. The testatrix was in poor health and died soon after the will was made. No proof was given, except proof of the signatures of the subscribing witnesses. The court held, that the circumstances of the case were sufficient to excite suspicion, which ought to be removed, and there being no evidence to remove the suspicion, the will was refused probate; and in giving the decision of the court, this rule is laid down, that " when undue influence, importunity, or coercion, are objected, it is not enough to show merely their existence or the testator's liability to them, but the party must go on to satisfy the court that the testamentary act was obtained by means of them."

The case of *Stulz* v. *Schaeffle*, decided in the Prerogative Court in England, in 1852 (18 *Eng. Law & Eq. R.*, 576), has many features similar to the case under consideration, and the decision of Dr. Lushington brings out and applies the principles of law applicable to this class of cases in such manner as materially to aid in the examination of this case. The distinction between control and undue influence, and the kind of importunity necessary to invalidate a will, are so clearly and ably set forth in that decision that I have cited the case as in point, in this matter.

The conclusions to which I have arrived in this case are, that the circumstances of the age, want of sight, loneliness, and imbecility of the testator; his situation at the house of Mrs. Titlar, his dependence upon her, and his confidence in

his old friends and associates, Mr. Turhune and Mr. Hope, and the change made by the liberal provision in the last will in favor of Mrs. Titlar, against the natural inclination of a close and penurious man, impose upon the propounders of this will the burden of removing the suspicions excited by those circumstances, and of satisfying the court that the will offered for probate is the free will of a capable testator:

That the inference of undue influence to be drawn from the occurrences which took place at the funeral of Mrs. Malcolm; from the obtaining of the will of the deceased before he went to New Jersey; from the acts of the parties in getting Mr. Malcolm from the house of Mr. Hick to the house of Mrs. Titlar, in Williamsburgh; from the refusal to permit the relatives to see the deceased while at Mrs. Titlar's; from the efforts of Mr. Turhune and Mr. Hope to procure this last will; from the declarations of Mrs. Titlar that she was secured; and from other circumstances introduced in opposition to this will, is rebutted and overcome by the evidence of the witnesses who drew the will and attended the execution, who took their instructions entirely from the testator, and prepared the instrument according to those instructions in such manner, as to show beyond reasonable doubt, I think, that these directions emanated from the testator, and were the work of his own free will; and by the testimony of the witnesses as to the improvement of the health of the testator, after he went to Williamsburgh, as to his condition while there, and as to his declarations after making the will, that he had arranged every thing to his satisfaction.

On the whole case, I am satisfied that the suspicions excited in reference to this will, are satisfactorily removed, and that the instrument offered for probate is the last will and testament of James Malcolm, deceased.

I shall, therefore, admit the same to probate as a valid will of real and personal estate.