## Julia Beaubien and others v. Mary A. Cicotte and others.

*Evidence on probate of will: alleged fraud: res gestae.* — Where a will is con tested on the ground of fraud· or undue influence, a very broad inquiry is permitted into the whole chain of circumstances attending its preparation : and the transaction must be deemed to embrace all the immediate preliminaries.

Where the instructions for executing a will contemplated that the attending physician should be sent for to attest it, the *res gestae* necessarily embrace this as one of the steps actually taken ; and what message was sent, or received and acted upon, is therefore admissible, as a circumstance which may have weight or not, as made significant or not by other proofs.

*Evidence : inquiry as to conflicting statements of witness.* — The testimony of the attending witness, as to the nature of the message sent, being somewhat contradictory, it was held to be proper, on cross examination, to call his attention to his testimony on a former trial, and to ask him if he did not then state that a particular message was brought.

*Evidence: statements of witness impeaching his candor.* — A question to a witness whether he did not, on a former trial, testify that he said yes and no, and played good Lord and good devil, because he did not know into whose hands he might fall, is admissible, as going directly to his fairness and candor,

*Evidence : limit to re-examination.* — A witness on his cross-examination testified, that some years before he had a conversation with the deceased; but he gave no part of the conversation, and it did not appear to have had any bearing upon the controversy. It was held not competent for the opposite party, on re-examination, to inquire what was said by the deceased on that occasion.

*Probate of will : appeal : discharge of proponents to make them witnesses.* — If the Circuit Court, on appeal from an order of the Probate Court refusing to admit a will to probate, can allow part of the proponents to renounce and be discharged, in order to become witnesses, the power to do so is discretionary, and a refusal can not be reviewed on error.

BEAUBIEN *v.* CICOTTE.

*Evidence: refreshing witness's recollection.* — In order to refresh the recollection of a witness, his attention may be called to his evidence on a former trial, and counsel's minutes of the former testimony read for the purpose.

*Evidence: will: undue influence: declarations of testator.* — A will being assailed for fraud and undue influence on the part of the wife, statements of the testator that he regretted his marriage, that he was not master at home, that he was afraid of his wife, and was compelled to submit to her demands, or otherwise there would be trouble in the house, are admissible evidence.

*Evidence: impeachment of witness by contradictory statements.* — Where a subscribing witness to a will testifies to its due execution by a competent testator, evidence of his statement, on another occasion, that it was not worth the snap of his fingers, is competent by way of impeachment.

*Evidence: will: undue influence: proof of terms on which the family lived.* — A will which disinherited the testator's relatives in favor of his wife and her relatives, being assailed for undue influence and want of capacity, it was held competent to prove the wife's abuse of the husband's relatives, and her quarrel with him about a former will by which he had made provision for them. A wide range of inquiry into the family relations, and the terms upon which they lived is allowable in these cases.

Evidence that the testator made no complaint of any importunities on the part of his relatives, is also admissible in such case, where it appeared that the wife had made charges to him of their rapacity.

Evidence of former wills, and of other pecuniary arrangements for the wife, is also admissible, as having a bearing upon the question whether the testator has understandingly, and of his own free will, changed his settled views.

*Will: what necessary to its validity.* — A will is not valid unless the testator not only intends, of his own free will, to make such a disposition, but is capable of knowing what he is doing, of understanding to whom he gives his property, and in what proportions, and whom he is depriving of it as heirs, or as devisees under the will he revokes.

*Evidence: its general purpose.* — In all testimony the object of the law is, to enable the jury to know all that the witness knows which is pertinent to the issue; and every rule of evidence is designed to secure this end.

*Evidence: mental capacity : opinions of witnesses.* — There is nothing in the nature of inquiries concerning mental capacity which requires juries to be informed, of necessity, by other than ordinary witnesses.

Therefore in an inquiry concerning mental capacity to perform a certain act, witnesses who are not experts may testify to their opinions upon the question in controversy, based upon their own observations.

It is proper to put the question to the witness in such a way as to call for his opinion upon capacity with reference, as near as may be, to the very act or kind of act in dispute.

Accordingly, on a question of capacity to execute a will, it was held proper to ask a witness who had seen and conversed with the testator near the time of executing the instrument, whether, from the conversation then had with him, and from what he then saw of him, he was capable of comprehending or understanding a document of any considerable length, if it had been read to him.

Also, what capacity the testator had, at the time the witness saw him, to understand business matters. ...

Also, whether, in the opinion of the witness, the testator was, at the time, capable of holding a conversation like one testified by another witness to have taken place.

*Heard May 17th, 18th and 19th. Decided July 15th.*

Error to Wayne Circuit.

Joseph A. Moross, Julia Beaubien and Rose J. Moross, presented to the Probate Court for the County of Wayne, for probate and allowance, an instrument dated January 12, 1858, purporting to be the last will and testament of Antoine Beaubien, and attested by Isaac S. Smith, Israel A. Moross and F. Provost as subscribing witnesses. The will gave the whole of the property of the testator to his wife, Julia Beaubien, during her life time, with remainder to her children by a former marriage, Mary Millette, Rose J. Moross, Napoleon Millette, Joseph Millette and Israel Millette. Joseph A. Moross was named sole executor. On the hearing in the Probate Court, the will was disallowed, and the proponents appealed.

In the Circuit Court an issue was framed for trial by jury; the respondents, who were heirs at law of said Antoine Beaubien, denying generally the execution of the will, and also averring that at the time of the alleged execution thereof he was not of sound mind; that he was induced to sign it by undue influence exerted over him by said Julia Beaubien, now the wife of Thomas Coquillard, and others, at a time when both his mind and body were greatly enfeebled by old age and disease, and that the same was not his free, voluntary and intelligent act; and also that he was induced to sign the same by fraud and undue means.*

The case as presented in the Circuit Court, is so fully set forth in the opinion, that it is deemed unnecessary to give in this place anything except the testimony of Bishop LeFevre, upon which the principal questions in the case

* As to what it is necessary for the propounders to aver in framing such an issue, see this case, 8 *Mich.* 9.

arose. This testimony was given after the subscribing witnesses had testified to the circumstances attending the execution of the will, and Robert P. and James B. Eldredge had been examined relative to the drafting of the same, and the instructions therefor.

Peter P. LeFevre, called for the contestants, testified as follows: "I knew Antoine Beaubien during his life - time, from 1842 until his death. I have held the office of Bishop of Detroit for the Catholic Church. Beaubien was a member of that church, and I was very intimately acquainted with him."

Witness then proceeded to state in detail the nature of his relations to Mr. Beaubien, for several years previous to his death, his degree of intimacy with him and what business and other transactions they had together, all tending to show the nature and degree of Beaubien's mental capacity when in health; and also testified to his opinion as to said capacity.

And he further testified, in substance, that sometime in the year 1853 said Beaubien came to him, and complained of the conduct of Mr. Meldrum, who was then acting as his agent, attending to his affairs. He said that Meldrum had got him to sign some paper which divested him of all legal right to his property, and on account of which he (Beaubien) threatened to, and did afterwards, commence a suit against said Meldrum. That the Chicago Beaubiens were at the same time carrying on a suit against said Antoine and others, in relation to the title of his farm, and the old man appeared in much trouble.

That about this time said Antoine informed witness that Capt. Cicotte had advised him to sell his property, and had informed him that Van Dyke would purchase it. That Beaubien afterwards came to him, and said that Van Dyke offered him $54,000, but insisted upon his consulting with witness. That witness advised him to accept the offer. That papers were drawn. They were

brought to witness's room, and witness explained them to Beaubien; and also that Van Dyke took the purchase subject to the litigation with Meldrum and that with the Chicago Beaubiens, and the papers were then executed. Witness afterwards saw Meldrum for Van Dyke, and assisted in settling the litigation with him.

And witness then further testified as follows: "After papers were signed by Mr. and Mrs. Beaubien, I told them they did not think very likely what they had done. That Mrs. Beaubien, by signing the deed, had signed away all right to his property. That if he, Mr. Beaubien, should die to-morrow, they might put his wife out of doors without any provision. He appeared to be startled. I said I know you did not intend to leave her without provision. He said, no. I said it was for him to provide for her. He asked what he should do? I said, consider you were at the point of death, and do for her as you would then wish to do for her. I told him: your wife is yet young, and has five children. He asked me what he ought to give her? I said, it is for you to say. He asked me if $20,000 was sufficient? I said, yes. I then counselled him to leave the $20,000 to her children, so that they should have something when they became of age. He said he would do it. I told him, as he might die at any time, he had better do it before leaving my room. Van Dyke, J. M. Howard, and Mandell were there, and the paper was drawn in my room, and executed by Mr. Beaubien."

Contestants' counsel here called upon Mr. Howard, proponents' counsel, to produce that agreement.

Mr. Howard replied that it was not in Court, but explained that it was an agreement by Mr. Beaubien to settle $20,000 on his wife for life, and on her children after her death.

*Question by contestants' counsel.* Do you know what Mr. Beaubien claimed in regard to the Meldrum deed?

*Answer.* He complained various ways about it, and

came frequently to see me about it. Don't know what he claimed, or how the deed was obtained. This deed was made without my knowledge. Meldrum also came to see me about it. Mr. Beaubien had frequently expressed to Meldrum his dissatisfaction. Meldrum came to ' me, and said Beaubien was coming also. They brought the papers. I read and explained them as well as time would permit. Beaubien was not satisfied. It was a trust deed or contract. Can't say what Beaubien claimed as to how they were obtained. Beaubien came again and expressed dissatisfaction. And some three weeks afterwards he came again. Van D. said as people talked so much, he was afraid that Beaubien might be dissatisfied, and he did not want to keep the trade if he was, and wanted to give back the papers and every thing should be null and void.

And witness further testified as follows: " Shortly after the conveyance to Mr. Van Dyke, Mr. Beaubien came to see me again about a will. I said to him, Mr. Beaubien, you have never done much for your relations. You have educated some of them, but you have not left them much. Many of them are poor. I told him, I should be sorry for him to leave this world, and leave any of his relations with uncharitable feelings. That he had made no provision for them by will. I then counselled him to make a will. I then named several of the Beaubiens. I named Henry Beaubien, Louis Beaubien, and the family of Lambert Beaubien. I also mentioned Mrs. Dr. White, as the doctor had said that he had never given her anything. He mentioned Johnny Campau himself, some of the Labidies, others of the Lambert Beaubien family. I mentioned all the children of Lambert Beaubien. I believe he mentioned Veronique Cicotte, sister of Lambert Beaubien. He seemed to assent to what I said. Mr. Van Dyke came, I believe next day, to take the notes of the will to be drawn up. He took notes and was to draw up the will at his room, and Mr. and Mrs. Beaubien were to go there.

Afterwards, Van Dyke said they went to Howard's office." (A copy of the will of March 10, 1854, was here shown to witness, which Mr. Howard, counsel for the proponents, admitted to be a copy of the will drawn up by him.)

The witness, referring to this will, further testified: "I think the provisions of this will for the various members of the Beaubien family are about what we talked over at the interview. This conversation was some time after the Van Dyke transaction. I never knew anything about this will, except that Van Dyke told me that Howard had drawn up the will. Beaubien never talked with me about the will after that. I heard no more of any other will until after his death, and then I was surprised, because I never heard of it."

Said witness then further testified, as follows:

"I did not see Mr. Beaubien so often the fall before he died as prior to that time. Don't recollect of seeing him that fall before he was sick. I heard he was sick, and a few days after New Year's went to see him. He was sitting upon a settee in the sitting room. Whether he was lying down, I can't say. I talked with him, and he was quite sick, very sallow as to complexion, and had no courage. He seemed to pick up a little when I spoke to him. Mrs. Beaubien presented us a couple of glasses of wine. I asked him to drink with me, and he said, I don't drink. He stood up when I drank my glass, and bowed, then sat down and conversed a little while. The conversation was a very common and uninteresting one, mostly with Mrs. Beaubien, who talked, while Mr. Beaubien listened, and sometimes, when addressed, he replied. I remember Mr. Beaubien said he had taken some kind of vegetable pills, and I replied I thought harsh medicines would not be good for him, an old man: This was addressed to Mrs. Beaubien. She seemed to like it. He said nothing about the pills. I thought the way he looked to me he would not recover. He seemed to be very low

spirited, as a man in his condition would be. The conversation was particularly between his wife and myself. Can't remember all that passed, but something about his health. Don't remember that he asked me any questions at all. When we addressed him, he would answer, but very short. The man was sick, was low spirited and very weak. My visit was the common length of an ordinary visit. Most of the talk was with Mrs. Beaubien. Did not talk with Mr. Beaubien very much. He appeared very sick. Don't think his capacity was impaired, except by his sickness. It was very much impaired. He was very sick. When I suggested about his recovering he seemed to doubt it. Seemed to have a presentiment of dying very soon. At other times, when he was not sick, he was very talkative. Then I thought he could not talk much, was very low spirited, and seemed to think almost certainly he was going to die. Generally opened his mind very fully to me, but now could not. Think he tried to talk more than usual, on account of my being there."

Counsel for contestants here proposed to read from his minutes of Ignace Moross's testimony, as to conversation with Beaubien the evening before the execution of will, and ask witness if, in his opinion, Beaubien was, at the time he saw him, capable of holding that conversation? Counsel for proponents objected, and after some discussion, the Court asked the following question:

From the conversation you then had with Mr. Beaubien, and what you saw of him, was he capable of comprehending or understanding a document of any considerable length, if it had been read to him in his own language?

To which question counsel for proponents objected, but the Court overruled the objection, and proponents' counsel excepted.

The witness answered: I think he could not; he was very much sunken. I don't think he could keep his attention long enough at a time to understand it. I advised

him to abandon worldly affairs, and attend to the matter of his eternal salvation. He did seem to understand simple, short questions. It seemed to be an effort when he had to answer four or five words. He seemed very feeble and weak.

The Court also proposed the following question:

What capacity had Mr. Beaubien at the time you saw him to understand business matters?

Proponents' counsel objected to the question. The Court overruled the objection, and proponents' counsel excepted.

The witness then answered: From all that I could see as to his capacity, he had very little capacity to under- stand business. He was very sick and weak, and when- ever I asked him a question, he made an effort to answer, and did answer very short. Showed plainly he had very little capacity to transact business.

I can't tell the exact date of my visit, but it was before the 12th of January. It was before Epiphany, which is thirteen days after Christmas.

*Question by contestants' counsel.* In your opinion, was he at that time mentally capable of holding a conversation like this, (reading from his minutes of Ignace Moross's testimony, as follows, viz:) "I knew he said something at that time about old Cicotte, old White Head, that he was a plaguey old rogue. He said there was a provision for old White Head in that will, but he said he would not give him anything; he was an old rogue, and always sticking his nose in other people's business."

Proponents' counsel objected to the question. The Court overruled the objection and proponents' counsel excepted.

The witness then answered: I think he was not capa- ble of holding that conversation. He was, I believe, inca- pable of holding any continuous conversation when I saw him. I was there perhaps three quarters of an hour, per-

haps a little less or a little more. Don't recollect that
he asked me any question. Talked mostly to his wife. I
sometimes addressed him, and he answered yes or no. I
saw Mr. Beaubien once after this, either two or three days
before his death; I could not say exactly, but shortly
before he died, one or two days. He then received the
last offices. of the Church. Another clergyman went
with me.

Contestants' counsel proposed to call witness's attention
to his testimony on former trial, as to time of his last
visit, to refresh witness's recollection.

Howard, for proponents, objects. Objection overruled
and exception taken.

Counsel for contestants then read to witness his min-
utes of witness's testimony on former trial, that his visit
was from four to five days before Beaubien's death. Wit-
said he thought his testimony on former trial likely to
be correct. He then proceeded :

I had hard work to wake him. He was on the bed,
slumbering. He recognized me. Sometime after being
awakened he sunk into slumber again. Whether under the
influence of morphine, or not, I can not tell. I saw his
end was approaching. I roused him more than once. Was
in the room eight or ten minutes perhaps. Can't say
exactly. I had no conversation with him then. I roused
him up, and asked him how he felt. He replied he felt
very badly, as near as I can remember, and sank down.
The first time I saw him his memory was very weak. I
saw that his memory. had failed before he was sick, with
age. He remembered some things that took place long
ago.

The Court asked the witness : Was any conversation
had which tended to test Beaubien's memory ?

Witness answered : No. I had no such conversation.
I did not ask him questions, but from his general condi-
tion should think he could not have had much memory.

BEAUBIEN v. CICOTTE.

Being cross-examined, the witness testified: "My first visit to Beaubien was between New Year's and Epiphany.

I met him frequently that fall, and had conversations with him. Had no business with him, but had met him casually, and we had saluted, each other in the usual way. Think my visit to Beaubien's before Epiphany was in the afternoon. My visit was a mere neighborly New Year's call. I had heard that he was sick, and it was one reason, and also to call on the family. I had no business, and no special religious object; a mere friendly pastoral visit. I found Mr. Beaubien sitting on a settee in the dining room. His wife was there, and some of the children, and, I think, Joseph Moross. I shook hands with Beaubien when I went in, and saluted him in the usual way. Asked him how, he did. Asked him the nature of his sickness. I don't remember that he described his symptoms. Mrs. Beaubien answered. He appeared to be quite weak, and had a sallow complexion. Mrs. Beaubien said the vegetable pills he had taken had operated, and she proposed to get some more. The pills had been taken the night before or that morning. Can't say which. Mrs. B. said, they had just operated. I at that time apprehended that the disease might prove fatal. I may have told Mrs. Beaubien to take good care of him. I had a private conversation with her in the hall, and might have told her that I thought Beaubien's sickness might prove fatal. My visit was from one-half to three-quarters of an hour. I believe there was some conversation at that time about Mr. Lyell and his failure. It was with Mrs. Beaubien. She kept up the conversation. I might have asked Mrs. Beaubien how much money they had at Lyell's, I had heard that Beaubien had lost quite a large sum by Lyell. Mr. Beaubien in that conversation might have told me the amount, but the principal conversation was with Mrs. Beaubien. Can not remember whether Beaubien told me the amount. Sometimes from time to time he nodded,

and sometimes answered. I don't remember that Beau-
bien said that he believed that he had lost the money at
Lyell's. Think Mrs. Beaubien said so, and he nodded or
·said something, and I have no doubt he understood it. I
don't remember any other conversation at that time. Don't
remember that we referred to any long - gone circumstan-
ces of Beaubien's life. I spoke about his health, the health
of Mrs. Beaubien, and of the children. I believe, in sub-
stance, I told him he should lay the world aside, and
think of that eternity where we all must go. That I
might die before him. That is about all. He appeared
to understand what I said about religious subjects.
Appeared depressed. I don't remember that I stated on
former trial that Mr. Beaubien enjoyed my religious advice
and expressed a wish to live longer. He evidently desired
to live longer, but feared he would die. I don't remem-
ber that when the glass of wine was presented to Beau-
bien he said he did not·drink. I don't remember that I
so testified. He said he did not want to drink. He was
then capable of recognizing his friends and neighbors if
they had come in. He recognized me. Recognized me
the last time that I visited him. He appeared to be glad
to see me at my first visit about the 6th of January.
The conversation on that occasion was not an interesting
one, and I may have stated on my former examination
that the conversation, except upon religious subjects, was
very uninteresting to me. His mind at that time was not
deranged.. I did not hear him use on that occasion one
irrational expression. He was never deranged.    *    *

Mr. Beaubien had but little conversation. Could not
infer that he was deranged. Spoke very briefly. I do not
think he exhibited any want of memory as to the Lyell
matter. Mrs. Beaubien did the talking. All of the con-
versation was with Mrs. Beaubien, and from time to time
he would say "yes," or something of that sort. Did not
see him but twice. Did not give him the last sacrament

myself. Told Mr. Sothers to do it, and I waited in the next room. It is according to the rules of the Catholic Church to give the last rites to a man, even if speech-less. If a man is not speechless, but stupid, the priest can not hear confession, but he would give him absolution, hoping he may have understood. Priest will not take con-fession if a man is out of his mind so that he can not understand anything about it, but he would give him absolution. Can't say from my own knowledge, that con-fession was then had. When I went into the house on my first visit, the old man was up and dressed."

The above is, in substance, all the testimony of said witness in regard to his visit to Mr. Beaubien about the 6th of January, 1858.

The jury rendered a verdict against the will.

*Newberry & Pond* and *J. M. Howard*, for plaintiffs in error:[*]

The Court erred in admitting the questions propoun-ded to the witness LeFevre.

The objection to these questions is, that they called for the opinion of the witness relative to a matter concern-ing which his opinion was not competent evidence.

It is undoubtedly now settled, that "upon questions of mental capacity even non - professional witnesses may give evidence, not only of specific facts and conduct falling under their own observation, but also of the *impressions* they derived *at the time*, involving to *some extent* matters of opinion." Per. Campbell J. in *White v. Bailey*, 10 *Mich.* 161. See also *Dewitt v. Barley*, 17 *N. Y.* 340.

An examination of the American authorities will how-ever show:

1. That the admissibility in evidence of such opinions from non - professional witnesses, other than subscribing

[*] Only the arguments of counsel on the principal point involved in the case are given.

witnesses to wills, has not been settled without some considerable conflict.

2. That as to the extent and limit of the admissibility of such opinions, and also as to the proper form of questions calling for the same, there is still much conflict and confusion.

This conflict and confusion seem to have sprung from two causes, to wit:

1. Inquiries as to mental capacity most frequently occur in cases involving the establishment of wills. With this class of cases the English common law courts have never had anything to do. Exclusive jurisdiction over them has been, and is vested in the ecclesiastical courts. When, therefore, such jurisdiction was first given to American common law courts, either directly or by appeal from surrogate and probate courts, the ecclesiastical courts were naturally but inconsiderately looked to and followed as authority upon questions of evidence.

2. Two classes of cases have been inadvertently treated as a single class, to wit:

*First Class.* — Where the inquiry is as to sanity or insanity.

*Second Class.* — Where sanity is conceded, and the inquiry is as to degree of mental capacity.

To these two causes, and principally to the first, we think is to be attributed the fact that respectable American common law courts have permitted witnesses to testify to their opinions in general terms, that the party whose capacity was the subject of inquiry, "was fit or unfit to make a will." 11 *S. & R.* 141. "Was of sound and disposing mind, and capable of executing a valid deed or contract." 7 *Gill*, 10. "Was not in a sound state of mind" (where the question was as to degree of capacity). 5 *Iowa*, 875. "Was capable of making a contract or transacting important business." 23 *Penn.* 117. "Was competent to transact any ordinary business, and

had sufficient mind, memory, and understanding to make a valid deed or contract." 7 *Md.* 165.

It is unnecessary in this Court to stop to contend, either against the admissibility of opinions to the extent of the above cases— 10 *Mich. supra,*—or that the ecclesiastical courts are not to be followed by common law courts, as authority upon questions of evidence. See *Wright v. Latham,* 5 *Clark & Fin.* 692, cited in *Dewitt v. Barley,* 9 *N. Y.* 371. As an illustration where such evidence would lead, see *Crew v. Crew,* 3 *Hagg.* 123.

Before we can determine the extent or limit to which opinions of witnesses upon questions of capacity are admissible, or whether the opinion called for in a particular case is admissible in that case, we must, of course, settle the principle upon which such opinions are at all admissible. This done, the rest is comparatively easy.

We have been able to find but three or four cases in which the question is discussed with any degree of care or thoroughness.

[Counsel then proceeded to an examination and analysis of the cases of *Clary's Admr's v. Clary,* 2 *Ired.* 78; *Clark v. State,* 12 *Ohio,* 483; *Dewitt v. Barley,* 9 *N. Y.* 371; *same case,* 17 *N. Y.* 340, arriving at the conclusion that the admissibility of opinions upon questions of sanity and mental capacity is based upon the principle which admits opinions upon questions of identity, handwriting, temper, disposition, etc.]

Can we, then, lay down any general rule as to the nature of the opinions thus admissible, and the extent to which admissible?

We think there is no trouble in doing so.

But first, let us for a moment glance at the nature of the testimony, which, under such principles, is admitted in other cases.

*Identity of persons or things.* — The witness *recalls* the impression left on his mind, by his prior acquaintance with

12 MICH.—2 E.

or knowledge of a particular person or thing, and compares that impression with an impression produced in his mind at the time he testifies by the presence of a person or thing, sought to be identified with the person or thing which produced such prior impression.

*Hand-writing.* — Evidently a question of identity; and testimony in regard to it of like nature.

*Intoxication.* — The witness recalls and states the impression produced upon his mind by the appearance and conduct of the party, whose condition is the matter under examination, *at the time to which the inquiry as to his condition relates.* An act of *memory.*

*Temper* and *Affection.* — The witness recalls and states an impression as in the last case.

The rule we think has become self-apparent.

It is clearly indicated in the quotation we have made *supra* from the opinion of Campbell J., in *White v. Bailey*, and may be thus stated:

The opinions or impressions admissible are opinions formed or impressions made upon the mind of the witnesses (bearing, of course, upon the question of sanity or degree of capacity) *at the time*, by what they saw or observed.

Witnesses can not, at the time they are giving their testimony, be called upon, or permitted to reason or draw conclusions, in the form of opinions, from what they saw and observed at a prior time, and their present recollection of opinions then formed, or impressions made upon their minds, by what they so saw and observed.

To permit them to do so, would be to make them experts; the basis of their testimony, as experts, being not a hypothetical statement of facts, but certain facts, which, at a prior time, came under the witnesses' observation, and present recollection of opinions then formed or impressions made upon their minds by what they so saw and observed.

The question put to the witnesses calling for opinion must be, not *what is*, but, *what was*.

That this is so, may be demonstrated by a very simple test — to wit:

Suppose a witness, after having stated his acquaintance with the party whose sanity or capacity is in question, upon being asked, if he formed any opinion or received any impression from what he saw and observed, relative to such party's sanity or capacity, should answer in the negative; would it be competent to request him to consider and reflect upon what he had thus seen and observed relative to such party's sanity or capacity, and give the opinion which he should form thereon? Clearly not.

We submit, that the necessity which calls for the admission of opinions at all in inquiries of this character, is fully satisfied by its admission to the extent indicated, and to go beyond, would only lead to uncertainty and confusion.

If the rule we have sought to establish is the correct one, no argument is needed to show that neither of the questions involved in this point were admissible. It is self-apparent.

Neither of them called for any opinion formed or impression made upon the mind of the witness at the time of the interview concerning which he had testified; but each of them for an opinion, which he must necessarily form at the very moment.

But it will be said, that these questions were asked and were admissible for the purpose of obtaining the witness's opinion of the degree of capacity of Mr. Beaubien at the time he saw him, measured by some definite intelligible standard.

We reply; that if the witness formed an opinion as to any definite degree of capacity, possessed by Mr. Beaubien, it must have been by reference to some standard of

measurement then before him, to wit: some particular act which Mr. Beaubien was called upon to attempt or did attempt in his presence, requiring an exhibition of capacity; such for instance as the transaction of a particular matter of business. And the witness's opinion 'must be measured to the jury by that standard.

If he had at the time no standard of measurement in his mind, it is evident he could have formed no opinion as to any definite or measurable degree of capacity, and therefore could express none. If he was permitted to attempt to do so, it would not be an opinion, but a guess.

If the witness had ·testified that he at a particular time read and attempted to explain to Mr. Beaubien a written instrument, he might have described to the jury the nature of that instrument, and expressed his opinion or impression, whether he succeeded in making Mr. Beaubien understand it.

But he could not go further and express an opinion, that he had not mental capacity to understand some other instrument, which he never read, or heard read to him, or saw him make an. attempt to understand.

*S. T. Douglass* for defendants in error:

In order to form an intelligent judgment as to the admissibility of the evidence of LeFevre, it is important in the outset to have a clear conception of the nature of the issues being tried.

The real and substantial question was, whether the paper propounded as the last will of Antoine Beaubien, (conceding it to have been executed with the proper formalities) expressed the purposes and intentions, or, in other words, the intelligent *will* of the testator as to the disposition which should. be made of his property after his decease:— 3 *Eng. Ecc. R.* 109; 4 *Ibid.* 34, 49, 51; 1 *Bradf.* 360, 363; 2 *Bradf.* 42, 16, 261; 2 *Bradf.* 133 ;

2 *Bradf.* 244; 3 *Ecc. R.* 167–8, 172, 187, 204; 4 *Ecc. R.* 72; 6 *Ecc. R.* 417, 420; *Ibid.* 350, 354; 25 *N. Y.* 23–25 and cases there cited, 104.

Involved in this issue was the question:

1. Whether, when the will was executed, the testator was *capable* of making it, or, in other words, whether he had sufficient mind to be able to comprehend the nature and effect of the act he was performing, the relation which he held to the various individuals who might naturally · be expected to become the objects of his bounty, so as to be capable of making a rational selection among them.

2. Whether, conceding that he possessed this moder. ate degree of intellect, the making of this will was an act of his own intelligent volition, or whether it was procured through undue influence exerted by others. *See cases above cited.*

How can the Court and jury be best enabled to determine such an issue by the aid of testimony — the only means of investigating truth in courts of justice?

Witnesses may be called to testify to such acts, con- duct, demeanor and conversation of the deceased, as tend to show the degree of his capacity. This is undoubtedly the best and safest kind of evidence for the purpose, and should be availed of as far as it is practicable to do so. But we all know that it is available only to a limited extent.

It is hardly possible for any of us to observe the appearance, acts, conduct and conversation of another, even for a brief period, without forming some judgment as to the degree of his capacity.

This judgment, though it seems intuitive — because reached by mental processes, so rapid and unconscious — is really an inference from facts observed.

But the facts are so numerous, individually so unimpor tant, or have followed each other in such quick succession,

that, if called upon to state the grounds of our judgment, we should find it impossible to do so. The facts are, for the most part, from their nature, incapable of being analyzed and separately considered and described in language by the most subtle intellect. They will be only very partially retained by the most tenacious memory. A few salient circumstances, if any such happened to fall within our observation, we may be able to describe to another; but the description will not, in most cases, enable him to form more than an extremely incomplete and inadequate conception of the grounds of our conviction, or more than a very hazy and unsatisfactory opinion of his own. These salient facts, though capable of being narrated or described, may be less convincing and decisive in their nature, and have had less influence in producing the opinion we have formed, than other facts which are indescribable.

It is because of this peculiar and incommunicable nature of the facts and circumstances which indicate the degree of a man's mental capacity, that, on questions of capacity, courts have been compelled to allow witnesses, after having stated in full their opportunities for observation, and, so far as they can, the facts observed, to state their opinions as to capacity, founded upon what they observed.

This exception to the general rule, excluding the opinions of witnesses (though it has had a hard struggle for a foothold in this country) is now well established: — 1 *Greenl. Ev.* §§ 440, 216, 691; *Dewitt v. Barley,* 5 *Seld.* 371, 380; *same case,* 17 *N. Y.* 340, 348-9.

In England, in the ecclesiastical courts, the opinions of witnesses as to capacity, whether laymen or experts, have always been freely admitted. Such, also, has been the case in a majority of the States of the Union. Though in some of them only the subscribing witnesses to a will are allowed to give such evidence: — 1 *Greenl. Ev.* § 440.

In the ecclesiastical and other courts, where such evidence has been held admissible, the witness has generally

been allowed to testify to his opinion as to the capacity of the testator to *make a will*, or *to make the particular will in question*. It seems to have been very generally assumed that it was only by permitting this, that evidence of opinion could be made available. *See cases above cited.*

It is quite manifest, when attention is called to it, that such evidence involves an expression of the witness's opinion on matter of law as well as of fact — namely, the opinion of the witness as to the degree of capacity required to enable a person to make a valid will.

That evidence open to so grave an objection, should have been so generally received, or, indeed, that it should have been received at all, and that a distinction should have been made by some courts between the case of subscribing and other witnesses upon grounds so specious and unsubstantial as those assigned for it — 1 *Greenl. Ev.* §§ 440, 216, 691 — evinces in the strongest manner how deeply sensible courts have been of the necessity for admitting evidence of opinion on questions of capacity.

That the evidence of this kind very generally received was open to such an objection, we think, explains, in some degree, why some courts, feeling rather than distinctly apprehending the objection, and conceiving it to belong to the nature of such testimony, have gone so far as to reject evidence of opinion altogether: — *Dewitt v. Barley*, 5 *Seld.* 371, *and cases there cited by Mason J.*

Had the views expressed by the learned and very able judge (Selden), who delivered the opinion in *Dewitt v. Barley*, 17 *N. Y.*, 340, been conceived and enunciated at an early day, we apprehend that there would have been little conflict as to the admissibility of evidence of opinion in respect to capacity.

The case holds that the opinion of a witness, founded upon his own observation, whether as subscribing witness, expert or layman, as to the degree or extent of a testator's

capacity, is admissible; but excludes all such evidence as involves any expression of the witness's opinion upon any matter of law, as, for example, what degree of capacity is requisite in order to enable a person to make a valid will.

Under this decision, the authority of which we presume will not be controverted, you can not, as formerly was done, ask a witness, whether, in his opinion, the testator was capable of making *a* will, or of making *the* will in question; and yet you are clearly entitled to ask him any question, which, without calling for his opinion on any matter of law, will elicit his opinion as to what degree of capacity the testator had.

There is, unquestionably, considerable difficulty in accomplishing this, but the difficulty is inherent in the nature of the subject, and is not insurmountable.

We can conceive no way in which it can be done in a case like this, except by the witness stating, either in answer to interrogatories or otherwise, whether, in his opinion, the testator was capable of comprehending this or that particular thing — the contents of the will in question, or any thing else.

The evidence of the witness LeFevre is precisely of this character. There was involved in it no opinion on any matter in law. The only statement made by the witness, which can with any show of plausibility be claimed to involve any such opinion, was the remark that the testator " showed plainly that he had very little capacity to *transact* business," and this, if construed to involve any such opinion, was not called for by the question to which it purports to be in part the answer, and was not objected to by the contestants.

It will not be denied that the evidence tends to give that degree of precision to the witness's opinion of the testator's capacity, which, if opinion is received at all, and opinion involving matter of law is wholly excluded,

is necessary in order to shed any light on the issues in controversy.

The objection that opinion was only receivable as to whether the testator was capable of comprehending some particular thing which the witness, or some one else in his presence, endeavored to make him comprehend, assumes a limitation upon evidence of opinion not alluded to in the books; and if now made, and all evidence involving matter of law is excluded (as it should be), it would be far better at once to reject evidence of opinion altogether, for it will be so hedged about as to be of very little practical avail.

Take this case for illustration. The witness, LeFevre, visited Mr. Beaubien, not on business, but as his friend and spiritual adviser. He made no attempt to converse with him, except to inquire after his health, and give him some brief spiritual advice, for the *reason*, doubtless, that he perceived at once, on coming into his presence, that he was not capable of participating in or comprehending any other conversation. Beyond the fact that he was, considering his usual habit, and their former relations, remarkably taciturn, and that he appeared sometimes to make an effort to converse and could not, scarcely any clearly describable circumstance occurred which showed the degree of his capacity. And yet, from all he observed, he was enabled to form, and did form, an opinion on that subject. How would it have been possible, under the limitation proposed, to elicit that opinion?

CAMPBELL J. :

This case arises upon the will of Antoine Beaubien deceased, probate of which was refused in the Probate Court, and in the Circuit Court for Wayne county to which an appeal was brought. The will was opposed on the grounds of incapacity, and fraud and undue influence.

The proponents now bring error, alleging that the Court below received and rejected testimony improperly.

The will was sworn to have been executed at Detroit, on the 12th day of January, 1858. The testator had been married several years to the plaintiff in error, Julia Beaubien (now re-married to Thomas Coquillard), and had no children of his own. His wife had four children, one of whom, Rose, was married to Joseph A. Moross, who, with his wife, also joins in the writ of error. The will was drawn at Mt. Clemens, in Macomb county, by Robert P. Eldredge, who drew it from memoranda furnished by James B. Eldredge. Moross visited Mt. Clemens to get R. P. Eldredge to come to Detroit and draw it. He sent his son James, who was at that time a student at law. He testifies to having received instructions from Beaubien, through Mrs. Beaubien and Moross who interpeted between him and Beaubien, witness not understanding French, which was the language in which they conversed. R. P. Eldredge the next day drafted the will at Mt. Clemens from his son's memorandum, and gave it to Moross. This was on the day before the will is sworn to have been executed. He also gave Moross a memorandum, directing, among other things, that the attending physician of Mr. Beaubien should be present at the execution, and ask him if it was his will, and attest it as the principal subscribing witness. The persons present at the execution as witnesses were, Dr. Isaac S. Smith, Beaubien's physician (who lived at Grosse Point about nine miles from Detroit), Ignace Moross a brother of Joseph Moross, and Francis Provost.

Dr. Smith testified in his direct examination concerning the time and circumstances of the execution of the will, and that on that occasion a servant man came to his place after him, and said Mr. Beaubien wanted he should come down, and that witness arrived at the house from ten to eleven o'clock. Upon cross examination concerning

the time and circumstances of his going to Detroit, he stated; " A man, I suppose a servant, came for me the day of the execution of the will, and told me *that Mr. B. wanted me to come as soon as I could conveniently. He did not tell me to come in haste, and I did not hurry. Can't say whether the man came before breakfast ; think I got to Mr. Beaubien's about eleven o'clock.*" The next day, his cross - examination continuing, he testified : " I think that when the man came to call me on the day that [the will was executed, *he simply stated that Mr. Beaubien wanted to see me.*" He then states that the man must have come earlier than he before testified, and must have arrived at his house before breakfast, and by seven o'clock. Further on he testifies, "The man who came after me, at the time the will was executed, *said that Mr. Beaubien wanted I should come down and see him as quick as I could.*" He was then asked whether in his examination in the Probate Court he did not testify that the man who came for him *brought the message that Mr. Beaubien was very sick.* The question was objected to, but allowed under exception. Witness said it might have been so, and he might have said so. No ground for the objection to the question is given in the bill of exceptions, but it is alleged to be irrelevant, and hearsay. We think the testimony was not objectionable. Witness on his direct examination had undertaken to state what the messenger told him, and it seemed to have become important to ascertain the whole circumstances attending Dr. Smith's visit to Detroit; and whether it was hurried or deliberate. His own testimony had been somewhat inconsistent, and there would be no impropriety in suggesting to him — especially on cross - examination — whether he had not testified before upon the same point, in order to get at his best recollection. It can not be regarded as immaterial to ascertain all the details of a transaction which, if not a lawful and proper testamentary

transaction, must have involved an improper combination or conspiracy. If a will is not genuine, or is in any way improperly obtained, it is to be expected that no publicity will be given to the steps attending its preparation. In all cases, therefore, where a will is contested on any such ground, a very broad inquiry is permitted into the whole chain of circumstances attending its preparation; and the transaction must be deemed to embrace all the immediate preliminaries. It has always been held that inquiries concerning alleged frauds could not be limited by arbitrary rules, but that proof may be given of any matter at all tending to throw light upon the affair. It appears here that the instructions for executing the will contemplated that the physician should be sent for. The *res gestae* necessarily embrace this as one of the steps actually taken. What message was sent, or received and acted upon, is therefore admissible as a circumstance, which may have weight or not, as made significant or not by other proofs.

Objection was also made to allowing Dr. Smith to be asked whether he did not testify on a former trial that he "said yes and no, and played good Lord and good devil, because he did not know into whose hands he might fall." We can see no ground for any objection to this question. It would go very directly to his fairness and candor, and is one of those questions commonly allowed to test the value of the witness as one likely to afford reliable evidence to the jury.

Witness on cross-examination had stated that, some years before, he had a conversation with Mr. Beaubien in his wife's presence. No part of the conversation was given, and it does not appear what it was about. Plaintiffs in error sought, upon re-examination, to ascertain what Mr. Beaubien said on that occasion. This the Court refused to permit, as the cross-examination had not covered it. This refusal was correct. It does not appear to have had any bearing whatever upon any part of the contro-

versy, and would have been opening an entirely new field of investigation.

The proponents asked to have Joseph A. Moross and Rose J. Moross discharged from the case, upon exhibiting a renunciation by Moross of the executorship, and a quit claim from Rose to her mother of all interest under the will; and also proposed to have said Moross sworn as a. witness on such discharge. The Court refused to permit the change of parties to be made.

Whether parties who have taken an appeal from the court below, as proponents of a will, can be discharged in the appellate Court, is a question concerning which we have been referred to no satisfactory authorities. It has. been held in some cases that an original probate court may discharge, in its discretion. But if the power exists, it can hardly be claimed as a matter of right.

The proponents of a will, when they appeal from the decree refusing probate, become actors responsible for costs, and shaping the issue to suit themselves. Should they all withdraw, the appeal must go down, according to the ordinary rules governing such matters. If all can not with- draw, and all should desire to do so and yet to leave the controversy pending, it might be difficult to settle such a dispute if the right existed. The utmost that can be claimed, as we think, is that a court may use its discre- tion to allow a claimant to withdraw upon such terms as shall not prejudice the rest. It is intimated in *Brush v. Holland,* 3 *Bradf.* 240, that an executor can not withdraw after he has so far acted as to offer the will for probate. The question, except so far as it regards this suit, is unim- portant now, because parties are no longer excluded as witnesses. If there was any power in the Court to allow the application, it was discretionary, and the refusal is not. to be reviewed on error. We do not feel called upon, therefore, without further argument, to determine under

what circumstances, if any, such parties may be allowed to withdraw from the controversy.

The witness, Peter P. LeFevre, having testified concerning the time when he made a visit to Beaubien before his death, counsel for contestants were allowed, under objection, to call his attention to his testimony on a former trial, in order to refresh his recollection; and this was done by referring to and reading counsel's minutes of the former testimony.

The authorities recognize this as not improper. The modes of recalling a witness's memory to facts which he has forgotten can not be arbitrarily restricted, and, if suspicious means should ever be used, the remedy is to be found in cross-examination and comment: — 1 *Stark. Ev.* 177. The precise course allowed here was permitted in *Laws v. Reed*, 2 *Lew. Cr. Ca.* 152. Mr. Greenleaf also refers to some other decisions involving the same principle: — 1 *Greenl. Ev.* § 436, *note* 3. The point was not strenuously urged upon the argument, and we think the Court below committed no error in allowing the question to be put, or in allowing the reference to the former testimony of the witness.

One Matthias Rouleau who had been a gardener in Beaubien's employment for several years, but left him some time before his death, was permitted to testify to a conversation held with Beaubien shortly before his death, in which the deceased expressed regret at having married, and stated that he was not master at home; that he was afraid of his wife, and was compelled to submit to her demands, or otherwise there would be trouble in the house. The issue presented for trial involved questions of capacity and of undue influence. It has been held generally that the declarations of a testator concerning his feelings in regard to different persons are the best evidence of his real sentiments, where they are made sincerely and unreservedly. His feelings towards his wife, and

towards the relatives of his own who would be affected by such a testamentary provision as is set up for allowance, must necessarily be inquired into in order to get at the true state of the case. It is said by the Court in *Waterman v. Whitney*, 11 *N. Y.* 157, that "the mental strength and condition of the testator is directly in issue in every case of alleged undue influence; and the same evidence is admissible in every such case, as in cases where insanity or absolute incompetency is alleged. It is abundantly settled that upon either of these questions the declarations of the testator, made at or before the time of the execution of the will, are competent evidence." The question in that case was whether the same rule would permit the proof of subsequent declarations, and it was held it would. See also *Rambler v. Tryon*, 7 *S. & R.* 90; *Lightner v. Wike*, 4 *S. & R.* 203. We can perceive no ground upon which this testimony can be properly excluded.

Dr. Smith, who had testified in his direct examination to the valid execution of the will, and the capacity of the testator, was asked whether he had not, on a certain occasion, at Mr. Beaufait's house, had a conversation with George Moran and one Page, referring to Beaubien's death and will, and declaring that if the family should follow it up they would break the will, for it was not worth a snap of his fingers. This he denied. Moran was called upon the stand and asked whether, on that occasion, Smith made the remark mentioned concerning the will. The question being objected to was discussed, and withdrawn to introduce some preliminary inquiries which were objected to, and which related to the preliminary conversation touching Beaubien's death, and whether Moran had any conversation with Smith that night about the will, Smith having denied any conversation with him on any subject. The grounds of the objection were not given, but it is now claimed that the conversation, if had, was immaterial. We think the contradiction comes prop-

erly within the rule of impeachment. When a witness testifies on the stand that a paper was duly executed by a competent testator, his statement on another occasion that the instrument was worthless, is a clear contradiction on the very essence of the issue. The case of *Patchin v. Astor Mutual Ins. Co.*, 3 *Kern.* 268, where the same objection was made that is made here, that the statement was one of opinion and not of fact, is directly in point. It was in the witness's power, if he saw fit, admitting the conversation, to explain that it was a mere matter of opinion, and based upon the facts sworn to on the trial. Such a statement, however, upon so plain a matter, is usually' one which would be understood as intended to cover facts; and even if confined to opinion, it would, upon a question of capacity, and coming from the attending physician and subscribing witness, be as directly material to the issue, because the witness's opinion formed one of the most important parts of his testimony. It is difficult to conceive how a subscribing witness could declare a will worthless, and yet not intend to convey a statement of fact inconsistent with testimony which should show it to have been made by a man of sound mind, and acting without pressure. The preliminary questions were necessary in order to identify time and place, and the fact of a conversation. The subsequent rejection of testimony which should have been received can not affect the admissibility of this. The testimony of Trombley, to which similar objections were raised concerning preliminary questions, is express as to specific facts concerning the execution of the will, related to him by Smith, and not excluded or objected to. The preliminary inquiries were pertinent' and proper.

The testimony showing Mrs. Beaubien's abuse of the Beaubien family, when she ascertained the contents of a former will making provision for them, and her quarrel with her husband about it, was properly received. In all cases of this character it has been customary, as the reports

BEAUBIEN v. CICOTTE.

show, to allow a wide range of inquiry into the family relations, and the terms upon which they have lived. It would be impossible to obtain a clear idea concerning motives and probabilities without it. These cases, as before intimated, are determined generally upon circumstantial evidence; and it must be received upon all points tending to throw light upon the various family relations. The same remark will apply to the negative evidence that no complaint was made by Beaubien of any importunity from his natural heirs. Although of no great force alone, it had a tendency, if true, to show that her charges made to him about their rapacity did not meet with any response in his feelings, and also that he had not been driven to disinherit them by any such importunities of theirs. It was not irrelevant, and was admissible as throwing some light, however faint, upon these domestic affairs. The former wills, and other pecuniary arrangements for Mrs. Beaubien connected with them, were properly received in evidence. It is true, of course, that making one will does not, of itself, render it at all unlikely that another will may be substituted; but previous preferences and plans may have a plain bearing upon an issue, where the question arises whether the testator has understandingly, and of his own free will, changed his settled views. No case has been cited holding such proof inadmissible. It is of very frequent occurrence in the cases reported: — *Hughes v. Hughes*, 31 *Ala.* 519; 8 *S. & R.* 573; *Love v. Johnston*, 12 *Ired.* 355; *Dodge v. Meech*, 1 *Hagg.* 612; *Marsh v. Tyrrell*, 2 *Hagg.* 84; *Mynn v. Robinson*, 2 *Hagg.* 169; 1 *Jarm. on Wills*, 81 – 2 *and notes* (*Perkins, Ed.*)

The principal question argued upon the hearing related to the kind of evidence admissible to prove the extent of the testator's capacity, and the witnesses competent to give their opinions on the subject. We have had occasion in *White v. Bailey*, 10 *Mich.* 155, and *Evans v. People*, 12 *Mich.* 27, to refer to some features of this inquiry, but the

fullness of the argument in the present case, and the necessity of removing any doubts which may exist among practitioners in this State, render it proper for us to express our views more fully than was necessary in those cases. The case now before us furnishes a good example of its kind, inasmuch as it involves the investigation, not only of the actual extent of Mr. Beaubien's capacity to make a will if let alone, but also that of making a will unaffected by such influences as are alleged to have been at work to guide his action. The abstract question, how much capacity a man must have to make a will, is not very important, because, with but one or two exceptions, the authorities are entirely agreed upon all that it is necessary for us to consider. It can not be claimed that a will is valid, unless the testator not only intends of his own free will to make such a disposition, but is capable of knowing what he is doing, of understanding to whom he gives his property, and in what proportions, and whom he is depriving of it as heirs or devisees under the will he revokes: — *Harrison v. Rowan*, 3 *Wash. C. C.* 580; *Burger v. Hill*, 1 *Bradf.* 360; *Wier v. Fitzgerald*, 2 *Bradf.* 42; *Kinne v. Kinne*, 9 *Conn.* 102; *Sutton v. Sutton*, 5 *Harr.* 459; *Horne v. Horne*, 9 *Ired.* 99; *Converse v. Converse*, 21 *Vt.* 168. Whether he can be required to possess any further qualifications, we do not now propose to consider.

It was necessary, therefore, in the present case, for the jury to be made acquainted, as nearly as possible, with the precise condition of the testator, in order that they might judge of it as they would have done had they personally known all about it. In all testimony the object of the law is to enable the jury to know all that the witness knows, which is pertinent to the issue; and every rule of evidence is designed to secure this end. It is expected of jurors that they have the same powers of judgment possessed by ordinary men, but not the special knowledge belonging to certain occupations or studies. And

the first question which arises is, whether there in any-thing in the nature of inquiries concerning mental capacity, which requires juries to be informed, of necessity, by other than ordinary witnesses.

The law has always required mental capacity to render persons responsible for contracts, or crimes, as well as able to make wills, although not applying precisely the same rules to the three subjects.. In criminal cases, the jury, from time immemorial, have been obliged to pass upon the capacity of the accused. In civil cases, persons dealing with their neighbors have been held bound, generally, to form their conclusions of capacity at their peril, where they have had means of observation: — *Beavan v. McDonell*, 26 *E. L. & Eq.* 540. It is only in modern times that medical science has been brought to bear upon these matters. Except in obscure cases of disease, or those pecu-liar cases where the conduct and appearance of the alleged unsound person present nothing unreasonable or unusual, we have the same means — whether perfect or imperfect — which have always been had, of forming an opinion without medical aid, and no better.

The general stock of knowledge among unscientific men is now, as always, derived from common observation and experience, and, whether adequate or inadequate for all purposes, it certainly serves for most. This is especially true in regard to cases of natural decay from age or weak-ness. The appearances and effects of this decline are famil-iar to all mankind. And, while it is well that new means of information may be attainable, the law does not gener-ally exclude any class of men from being witnesses because there may be found wiser men, or more accute and sagac, ious observers.

Lord *Hale* remarks that " physic and salves were before licensed physicians and chirurgeons" (1 *Hale, P. C.* 429); and it is equally true that men were acquainted with the ordinary manifestations of mental weakness and unsoundness,

before they were included in the domain of science. By considering the manner in which questions of mental condition have been treated and investigated in the various courts, we may be enabled to understand what course has been the result of long experience.

The most common controversies, involving questions of mental condition, arose in criminal trials and prosecutions. And it is perhaps significant that questions of evidence on this subject have rarely been reported until very recently even in these. Had the tests of mental soundness been technical, and the inquiries to the witnesses been governed by peculiar rules, it can not be doubted that the books would have preserved some trace of the practice. But enough appears incidentally, to furnish sufficient light for our guidance. By the rules of the criminal law a person could not be held liable for criminal acts committed during mental unsoundness, nor could any step whatever be taken against him during the incapacity, whether it existed at the time of the offense, or was brought on afterwards. We have accordingly inquiries made, not only upon trial, but also upon arraignment and after conviction, as well as the special inquisition made for purposes of guardianship.

In the latter the condition of the person was to be determined · by personal inspection, as well as by the testimony of witnesses; while, upon appeal to the King in council, the personal examination appears to have been chiefly relied on: — *Fitzh. Nat. Br.* 232, 233; 1 *Hale, P. C.* 33. And personal examination and inspection has always been deemed of the utmost importance. A private examination by the chancellor has been of very frequent occurrence, and has often been entirely satisfactory. In all of these proceedings, while testimony is generally necessary, and in many cases scientific testimony is of the utmost value, yet the law has always regarded the subject as

usually open to the common understanding, and capable of being judged by personal intercourse.

In *ex parte Smith,* 1 *Swanst.* 7, it is said that where the lunatic is unfit to appear before the jury, and they can not all go to him, one or two go and examine, and report to the rest his state and condition. And in the *Matter of Russel,* 1 *Barb. Ch.* 38, the importance of having the jury see the alleged lunatic is declared in very strong terms, the chancellor expressing a determination to require his production on pain of punishment to those neglecting it. Accordingly Lord Hale says, "if a lunatic be indicted of a capital crime, and this appears to the Court, *the witnesses to prove the fact may and must also be examined, whether the prisoner were under actual lunacy at the time the offense was committed.*" And the question whether a person was *non compos mentis,* so as to excuse him from trial, or from punishment on conviction, is recognized as in the determination of the Judge, although Hale recommends an inquest in all doubtful cases; and this is now the general practice in England:—1 *Hale, P. C.* 35. According to him the Judge may even stop the trial, and discharge the petit jury, on discovering insanity; but the more common practice has been to direct an acquittal. In the case of *Regina v. Goode,* 7 *A. & E.* 536, where a prisoner was brought for arraignment into the Queen's Bench before all the Judges, and it was proposed to call a medical man before the jury of inquest to testify concerning his present state of mind, the Court said it was unnecessary, and the jury were instructed to decide from what had taken place in their presence, and found him insane. In the celebrated case of *Regina v. Oxford,* 9 *C. & P.* 525, where the prisoner was indicted for a treasonable attempt to murder the Queen, his insanity was proved by his relatives and other unprofessional witnesses. The report says, "The most material evidence as to the prisoner was given by an inspector of police, named Ted-

man, who saw him frequently for about eighteen months, during which he was barman." The opinion of this witness appears to have been given after showing the extent of his acquaintance, and without undertaking to describe the appearances on which he formed it; for afterwards, upon "being asked upon what fact he founded his opinion that the prisoner was of unsound mind," he proceeded to give some details of his conduct. Several eminent medical men were also examined, and in reference to their testimony the Court, through Lord *Denman, Ch. J.*, observed, "It may be that medical men may be more in the habit of observing cases of this kind than other persons; and there may be cases in which medical testimony may be essential; but I can not agree with the notion that moral insanity can be better judged of by medical men than by others." Baron *Alderson*, and Mr. Justice *Patterson* were associated with Lord *Denman* on this trial. The inquiries concerning the capacity and understanding of the deaf and dumb are included by the authorities within the same rule which governs as to capacity generally; and in these cases medical testimony does not appear to have been deemed important: — *Rex v. Pritchard*, 7 *C. & P.* 303; *Rex v. Dyson*, 7 *C. & P.* 305; *Rex v. Thomas Jones*, 1 *Leach C. C.* 120. No English case has been found by us, which, in criminal procedure, has required scientific evidence, to the exclusion of the testimony of ordinary witnesses acquainted with the accused. In the case of *Freeman v. The People*, 4 *Denio*, 9, where there was much controversy concerning the field which might be covered by the opinions of medical men, the opinions of ordinary witnesses, of the sanity of the defendant, were received on behalf of the prosecution without any exception from the defendant. And the question does not seem to have excited any serious discussion in criminal cases. The same evidence which is proper in one common law tribunal before a

jury, can not be improper in another.  The form of the questions is a distinct consideration, concerning which we may also derive light from the practice in criminal cases; and to this reference will be made presently.

The next class of cases requiring attention embraces those raising the question of testamentary capacity directly. That the English ecclesiastical courts allow witnesses of all kinds to testify to their opinions, concerning persons whom they have seen and known, is not to be questioned.  And the fact that these investigations are much more frequent there than elsewhere, is a reason why the results of their experience should be deemed of no small value.  But, inasmuch as some authorities referred to on the argument seem to intimate that those courts have introduced new and unsound rules of evidence, it may be proper to examine into the decisions and practice of other tribunals.  But, at the same time, it must be remembered that we are now considering a case which was appealed from a probate court, whose practice is largely borrowed from that of the English ecclesiastical courts; and it is not easy to perceive why testimony allowable in the lower court should be shut out on the hearing above.

It has never been disputed that the subscribing witnesses may testify concerning the actual mental condition of the testator, as freely as medical witnesses who speak from personal acquaintance and investigation.  The reasons given, by those courts which confine such testimony to these witnesses, are based upon the assumption that they are called in for the special purpose of scrutinizing the capacity, as well as the acts of the testator.  It is matter of every day experience that wills made *in extremis* must usually be witnessed by any persons who are conveniently to be found; and it is not often that much care is taken to procure educated or peculiarly intelligent witnesses; nor is their attention in fact very closely addressed to the question of capacity, beyond what

would naturally be the case with any other observers present. But, be this as it may, the rule assumes that any person of ordinary capacity may form a reliable opin‧ion concerning the condition of another, from simply witnessing the execution of a will, which is rarely drawn up or discussed in the presence of the attesting witnesses. It is little short of absurdity to hold that persons having equal or greater facilities, derived from personal acquaintance and long intercourse, are not as competent to form opinions as those who are required to have no opportunity beyond one brief interview. The rule is also fallacious, in ignoring the fact that, in most cases of alleged fraud or imbecility, the procurement of a will involves a suspicion of mal-practice, and that those relying upon a will improperly obtained would have a most dangerous advantage given them, by affording their subscribing witnesses a degree of credit which, in many instances, would render any attack upon their statements useless.

Referring, as before, to the English practice outside of the ecclesiastical courts, we find the commonest examples of the investigation of mental capacity in suits in chancery, brought to establish or set aside wills and devises. In these cases it is quite common to have the testimony perpetuated; and, whenever there is any serious controversy, an issue of *devisavit vel non* is sent down for trial. The rule in chancery requiring the examination of all the subscribing witnesses is thus explained by Lord Camden: "Sanity is the great fact the witness is to speak to when he comes to prove the attestation; and that is the true reason why a will can never be proved as an exhibit *viva voce* in chancery, though a deed may; for there must be liberty to cross-examine to this fact of sanity. From the same consideration it is become the invariable practice of that Court never to establish a will unless all the witnesses are examined; because the heir has a right to proof of sanity from every one of them whom the

statute has placed about his ancestor": — *Gresley's Eq. Ev.* 123. And if no examination has been had as to sanity, the cause will be adjourned to have it taken: — *Ibid.* The form of interrogatory calls directly for the conclusion of the witness, and is as follows: "Was the said testator, at the time of the execution of the said produced will or writing, of sound memory and understanding, or not, as you know, or for any and what reason or reasons believe": — *Gresley's Eq. Ev. Appx.* The form given in the Equity Draftsman is whether the testator was "of sound and disposing mind, memory and understanding, or how otherwise, as you for any and what reasons know or believe." In the case of *Tatham v. Wright*, 2 *Russ & M.* 1, where upwards of sixty witnesses were examined in the court of chancery, and upon the trial of the issue in the court of law, some quotations are given, showing what answers the witnesses were permitted to give, with the approval of the court. One of the attesting witnesses, after speaking of the weakness of John Marsden's, the testator's, faculties, said: "*That he was capable of making a plain strait-forward will or codicil, to a limited extent.*" On his cross-examination he gave his opinion as to the incapacity of Marsden to transact business, manage property, &c., very fully, and also that he "had not the power to follow his own inclinations, or to act as he wished without the restraint or control of the defendant Wright in matters of consequence, and that he had not a will of his own in such matters ; *that he did not think John Marsden was capable of giving written instructions or directions for his will to Giles Bleasdale, or to any other person ; and that, in his opinion, John Marsden was not capable of comprehending, combining together, and judging accurately of the nature and consequences 'of any legal instrument creating a variety of new rights and interests.*" Another witness said Marsden was of sufficiently sound and disposing mind, memory and understanding, to make a *plain*

*and simple will or codicil, though not to make an intri-
cate or complicated will or codicil.*" His cross-examination
corresponds almost exactly with that quoted from the
other witness. Another phrase quoted by *Tindal Ch. J.*
from one of the defendant's witnesses — not a subscribing
witness — is " he was utterly incapable of managing and
conducting his own affairs, *and of giving instructions for
such a will as that in question*, even divested of its
technicalities." The Master of the Rolls, the Lord Chancel-
lor *Brougham*, the chief Baron of the Exchequer Lord
*Lyndhurst*, and chief justice *Tindal*, all received and acted
upon this testimony, but sustained the will upon the whole
case. The heir (who was held not bound by the decree)
then brought ejectment, and the questions raised upon the
various trials were carried through all the courts, and
finally settled in the House of Lords: — *Wright v. Doe d.
Tatham*, 1 *A. & E.* 3; 7 *A. & E.* 313; 4 *Bing. N. C.*
489. It will be perceived by referring to these reports,
that the testimony concerning the capacity of the testa-
tor was introduced in the same way as in the chancery
cause, and the witnesses gave the same kind of opinions.
The controversy was thoroughly and sharply contested,
but no question whatever was raised, in any of the
courts, concerning the propriety of asking or receiving
these opinions. The case finally went up on the admissi-
bility of certain letters found opened among the testator's
receptacles, addressed to him but having no memoranda
made by him, and not proved to have been answered or
acted on. Letters answered seem to have been received
in evidence. These unanswered letters were offered to show
how he was treated by his friends; it being claimed
that they were in the nature of *res gestae*, and such as
would not have been written to a man lacking ordinary
capacity.

Lord *Denman*, and *Coleridge* and *Littledale JJ.* con-
curred in rejecting them, admitting, however, that the

slightest act of the testator connecting him with them would have made them admissible. *Patteson* and *Williams* *JJ.* had been of counsel, and gave no opinion. In the Exchequer Chamber, and in the House of Lords, some of the judges thought them admissible as *acts.* A majority regarded them as merely equivalent to the statement of opinions which should be rejected, *because not made under oath, nor under the test of cross-examination.* The practice of receiving the opinions of witnesses upon capacity is fully recognized, and such evidence is stated by *Alderson* B. to be not properly mere opinion, but a compendious way of reaching the fact of capacity which can not otherwise be explained. And to the same purport is the remark of *Parke* B. (who concurred with *Alderson* B. and the majority in rejecting the letters), who says: "The question is not what the capacity of the testator was reputed to be, but what it really was in point of fact; and though the opinion of a witness under oath, as to that fact, might be asked, *it would only be a compendious mode of ascertaining the result of the actual observation of the witness, from acts done, as to the habits and demeanor of the deceased.*" In this case some of the Judges say that if the ecclesiastical courts admitted evidence of the manner in which a person was treated by others, independent of his own acts under that treatment, they disapproved the practice; but it is not intimated by any one that, in regard to the question in controversy before us, there was any difference in the practice of any of the courts. We do not feel called upon to express any opinion upon the point decided in that suit.

So far as the form of the question is concerned, it has been customary in all the courts to allow it in such a way as to test the capacity with reference, as near as may be, to the very act or kind of act in dispute. In *Rex v. Pritchard,* and *Rex v. Dyson,* before cited, this appears very clearly, as it does also in the cases above.

referred to. See also *Eggleston v. Kingston*, 8 *Ves.* 439. In several of the criminal decisions the proper form of a question to be put to the medical witnesses has been discussed, and it was finally referred by the House of Lords to the Judges, whether a form commonly used did not interfere with the prerogatives of the jury. That form was, whether, *from the testimony of the other witnesses*, the act of the prisoner was an act of insanity. In *Rex v. Wright, Russ. and Ry.* 456, this question was allowed, and it is said several of the Judges doubted its propriety. The witness was allowed to discuss the whole case upon the evidence of the rest. In *Rex v. Offord*, 5 *C. & P.* 168, which was tried subsequently, the evidence was received in that form. The case of *Rex v. Wright* was referred to in a note, but it does not appear whether the attention of the Court was called to it. In *Regina v. Pate*, 5 *Warren's Works*, 309, a physician who said that *from all he had heard that day*, and from personal observation, he was satisfied the prisoner was of unsound mind, was rebuked by *Alderson, B.* for assuming the functions of the Court and jury. In *McNaughton's case* the physicians were allowed to give their conclusions from the evidence, one of them summing up the entire case by saying that the prisoner was insane, and committed the offense while afflicted by a delusion, under which he appeared to have been laboring for a considerable length of time. The result of McNaughton's acquittal was an inquiry by the House of Lords into the general subject of insanity, and, among other things, whether a medical witness, who never saw the prisoner, but was present at the trial and heard the testimony, could be asked his opinion of the state of the prisoner's mind at the commission of the offense, or whether he was conscious of acting illegally, or laboring under any delusion. The Judges all agreed that the question was open to the objection that it allowed the witness to form his own conclusions

from the testimony of others, whereas their credibility should be determined by the jury. But otherwise the question was not deemed objectionable, and they stated it would be proper where there was no dispute or difference among the witnesses. *Maule J.* considered the question admissible according to the settled practice, although theoretically open to the objection named. *Opinions of Judges, note to Regina v. Higginson,* 1 *C. & K.* 129. In *Bainbridge v. Bainbridge, Taylor's Med. Juris.* 908, such a question was ruled out, on the ground suggested, while in the later case of *Duke of Manchester v. Bennet, Taylor's Med. Juris.* 901, 908, it was held competent.

From the best examination which it has been possible for us to make of the English practice, we are satisfied that in all of the courts, civil and criminal, as well as in the ecclesiastical courts, the practice concerning proof of mental condition is the same, and permits all who have had means of observation to testify concerning the existence and measure of capacity with reference to the matter in controversy; while it does not permit those who do not testify from personal observation to give a direct opinion of capacity, except upon some given hypothesis. In every case the witnesses who speak from their own observation are expected to describe, as well as they can, what has led to their conclusions, as well as their means of observation. But the cases referred to show that, in many instances, the results of very limited observation have been permitted; — the safeguard of cross-examination and a comparison of testimony being deemed sufficient to prevent any mischief from the inperfect knowledge of single witnesses.

In the United States, the authorities all require the witness to state such facts as he can, in order that the jury may be better enabled to determine the value of his opinions; — stress being of course laid upon his opportunities of judging. In many cases the facts which can be

described will be very significant to a jury, while there are many facts susceptible of a different interpretation, from which a jury could obtain no light whatever without the aid of the witness's judgment. The strongest indications of mental weakness or aberration often exist in expressions and appearances incapable of reproduction, even by an accomplished mimic; and yet decisive to any intelligent eye-witness. The great body of decisions in the United States adopt the English practice, and open the door to all testimony which can enlighten the jury, from every kind of witnesses. And in regard to the kind of weakness alleged to have existed in the case of Mr. Beaubien, there has been a very general feeling that very little aid can be had from strictly scientific witnesses, beyond that furnished by ordinary experience. The mere fact that a person is a physician does not of necessity qualify him to speak *ex cathedra* on this subject — especially when every one can assume the title with impunity. Men of real knowledge can always gain a respectful hearing on their own merits. The fact that in all important litigations the experts are found arrayed against each other, renders it necessary for the jury to determine which is right, and in doing this they must fall back upon their own knowledge of human nature. Judge *Redfield* has referred to this difficulty in the chapter on Senile Dementia: — *Am. Law Reg. for June*, 1864, *pp.* 458, 459. See also *Taylor's Med. Juris.* 890, 891, 907, and *Delafield v. Parish*, 25 *N. Y.* 9. And where the witnesses speak from their own observation, the questions which may be put to one, may be also properly put to another.

The authorities in this country have passed directly upon points which in England have been settled by unbroken practice; and we find, therefore, that here the admissibility of non-professional testimony has been discussed very fully. The general doctrine is, that all witnesses speaking from observation must, as far as possible, state

such facts as they can give as the basis of their opinion. This rule does not require them to describe what is not susceptible of description, nor to narrate facts enough to enable a jury to form an opinion from those alone. This would be impossible; and if it could be done, there would be no occasion for any opinion from the witnesses. It is a matter of daily experience that the opinion of an intelligent and familiar eye - witness is the only satisfactory means of ascertaining mental condition, or disposition, or expression, or any other of those impalpable but important facts upon which men rest in dealing with each other. There is no substitute for personal observation. But, if witnesses were not compellable to state such facts as are tangible, there would be no means of testing their truthfulness. When they state visible and intelligible appearances and acts, others who had the same means of observation may contradict them, or show significant and explanatory facts in addition; and if their story is fabricated, or if they describe facts having a medical explanation, medical experts may detect falsehood in inconsistent symptoms, or determine how far the symptoms truly given have a scientific bearing. But, from the nature of things, no rule can be laid down declaring what amount of acquaintance or what opportunities are necessary to enable an observer to be a witness. There are cases of insanity open to the slightest scrutiny, while others defy the keenest search. But no testimony can be of any real value, unless it appears the witness had adequate means and opportunities for forming some conclusion.

The cases of *Clary v. Clary*, 2 *Ired.* 78; *Clark v. State*, 12 *Ohio*, 483; *Potts v. House*, 6 *Geo.* 324; *Dunham's Appeal*, 27 *Conn.* 192; *Norris v. State*, 16 *Ala.* 776, and *Powell v. State*, 25 *Ala.* 21, are so full and satisfactory in their reasoning upon the admissibility of opinions from all witnesses speaking from personal knowledge, that nothing can be added to enforce them. To the same effect

are *Roberts v. Trawick,* 13 *Ala.* 68; *Watson v. Anderson,*
13 *Ala.* 202; *Florey v. Florey,* 24 *Ala.* 241; *Wilkinson v.*
*Moseley,* 30 *Ala.* 562; *Hughes v. Hughes,* 31 *Ala.* 519;
*Doe v. Reagan,* 5 *Blackf.* 217; *Rogers v. Walker,* 6 *Barr,*
371; *Kinne v. Kinne,* 9 *Conn.* 102; *Grant v. Thompson,*
4 *Conn.* 203; *Dicken v. Johnson,* 7 *Geo.* 484; *Townshend*
*v. Townshend,* 7 *Gill,* 10; *Dorsey v. Warfield,* 7 *Md.* 65;
*Baldwin v. State,* 12 *Mo.* 223; *Lester v. Pittsford,* 7
*Vt.* 158; *Dewitt v. Barley,* 17 *N. Y.* 340. Many other
cases might be added were it desirable to multiply citations.

The only remaining question is, in what form it is
allowable to introduce evidence of capacity. It was objected
on the hearing that a direct answer that a person is insane,
or incapable of doing one thing or another, is not receiva-
ble because usurping the office of the jury. The only
authority relied upon is a statement in Judge Selden's
opinion in *Dewitt v. Barley,* 17 *N. Y.* 340, that the decision
of the same court in the same cause, in 9 N. Y. 371,
was only binding upon that question, and not upon the
general doctrine of the inadmissibility of opinions for any
purpose. But while Judge Selden relies upon this distinc-
tion to avoid a conflict with a reported case, he distinctly
approves of the dissenting opinion of Judge Denio, which
demonstrates the propriety of just such inquiries; and the
whole of his reasoning is aimed at overthrowing the posi-
tion of the majority opinion on the former hearing. The
opinion of Judge Denio, in 9 N. Y., refers to numerous
cases in which the inquiry was made and answered dis-
tinctly. And in *Delafield v. Parish,* Judge Selden quotes,
as quite conclusive, the answers of some witnesses coming
directly within the supposed objection. Mr. Lord says, in
regard to the testator's condition at the date of the second
codicil, "*I had no doubt, and have not any, of his entire*
*capacity to understand what he was doing, and the effect*
*of it.*" The same witness speaks as to the testator's
capacity to make the third codicil, "*In my judgment it*

was perfect for the purpose of making a codicil of this kind; he fully understood it, and fully agreed to it." And Dr. Taylor testified, "I had not myself the least doubt of the soundness of his mind, nor could I have supposed that any intelligent person could doubt its soundness:" p. 106. This is the testimony upon which Judge Selden chiefly relied, and no suggestion is made by him, or any one else, that it was not admissible. The objection to a witness assuming the functions of a jury did not escape the notice of the court, a majority of whom held that a "medical witness can not be asked his general opinion (i. e. his conclusion from all the evidence), as to the state of the party's mind at the time of doing the act:" p. 75. A majority of the court concurred in so much of Judge Gould's opinion as commented on the attempt to introduce the opinions of medical men violating this rule. But no one held any of the opinions of the witnesses who spoke from their own observation to be incompetent, although there was a great deal of such testimony. They simply say of them that their value depends on how far they are sustained by facts: p. 38, 39. It can not be said, after the decision in Delafield v. Parish, that such opinions are regarded by the Court of Appeals as infringing upon the province of the jury. Nor have we discovered any ruling elsewhere excluding opinions in that form, where they are received at all. Counsel for plaintiffs in error admitted on the hearing that the general practice was to receive them, and referred to several authorities to that effect. They might be multiplied almost indefinitely. Thus, in Hughes v. Hughes, 31 Ala. 519, the testimony was that "the testator was of sound and disposing mind and understanding." In Culver v. Haslam, 7 Barb. 314, "not capable of transacting business understandingly." In Wier v. Fitzgerald, 2 Bradf. 42, the question went to the capacity to make a will. In Mowry v. Silber, 2 Bradf. 133, capacity to transact ordinary business. In Massachusetts, such witnesses

as may give opinions, give them in the same way: — *Poole v. Richardson*, 3 *Mass.* 330; *Buckminster v. Perry*, 4 *Mass* 593; *Hathorn v. King*, 8 *Mass.* 371; *Dickinson v. Barber*, 9 *Mass.* 225; *Needham v. Ide*, 5 *Pick.* 510; *Commonwealth v. Rogers*, 7 *Met.* 500. In this latter case *Shaw Ch. J.* explains the whole doctrine very clearly, and distinguishes between an opinion which the jury can estimate by the truthfulness and intelligence of the witness, and one which is based upon the witness's judgment of other testimony, which ho might believe and the jury might disbelieve. He says there is no legal objection because the opinion covers the substantial facts of the case—a thing which is done by direct testimony of facts in a majority of simple cases. To the same effect is *Lunning v. The State*, 1 *Chandler*, 178, 264. In *Cook v. Castner*, 9 *Cush.* 266, this subject is further elucidated by Chief Justice Shaw. That case involved an inquiry into the condition of a vessel's timbers at a prior date, and whether decay was ascertainable on inspection; and an expert was allowed to be asked whether, from his knowledge of the vessel, it would have been possible fifteen months before to take off a piece of the thick streak and replace it with new without discovering the rot; such replacing having occurred. In *Cottrill v. Myrick*, 3 *Fairf.* 222, where a stream had been improved, a witness was allowed to testify from his knowledge of the habits of certain fish, whether they could have ascended the river in its natural state. In *Willis v. Quimby*, 11 *Fost.* 485, a witness, not an expert, was permitted to state that a horse could not have been sound at a certain time, because soon after a disease appeared in his feet manifestly of long standing. In *Malton v. Nesbit*, 1 *C. & P.* 70, it was held that a nautical expert might testify that a given state of facts would be negligence, while in *Sills v. Brown*, 9 *C. & P.* 601, it was held such a witness could not be asked whether, *from the evidence he had heard*, there was such negligence. And

in *Fenwick v. Bell*, 1 *C. & K.* 312, it was held that a nautical witness might be asked whether, "having heard the evidence, *and admitting the facts as proved by the plaintiff to be true*, he was of opinion that a collision between the two ships could have been avoided by proper care on the part of the defendant's servants." These three cases illustrate very forcibly the true distinction as explained in the answers of the Judges to the House of Lords before referred to.

We think that there. can be no impropriety in allowing the opinions of the witnesses upon any measure of capacity which is calculated to aid the jury in coming to a conclusion. What we loosely term opinions and impressions are declared by many of the authorities to be no more nor less than statements of fact, differing from ordinary statements only because of peculiarity. of the subject. When a witness is asked what is the size or color of a certain object, or whether the evening is light or dark, clear or cloudy, the only difference between the impressions from which he speaks and those relied on in cases of capacity, is that they are less open to difference of opinion among observers. Evidence concerning personal identity must always be matter of opinion, but it is always received in a positive form. So may be evidence of value, of hand writing and the like, which are purely matters of opinion. Whenever the facts are such that the jury can not form an unaided opinion, it is essential that the opinions which they receive should enlighten them upon the exact point in controversy, if possible, for otherwise their verdict will be conjectural. The course of decision upon this subject is so complete and uniform that we must accept is as the practice found safest by experience. Juries are not bound to accept opinions unless they consider them well founded, and we do not find in practice that they are often misled by the opinions of eye witnesses who approve themselves sensible and candid.

BEAUBIEN *v.* CICOTTE.

The questions objected to in the case before us come very far within the rule laid down. [Capacity to understand an ordinary document, or to hold a continuous conversation, may certainly be inquired into as furnishing a means of informing the jury, as near as may be, of the extent of the testator's powers, physical and mental combined, as affecting his capacity to make the will propounded. Unless such inquiries can be made, it is hard to conceive to what point questions could be directed, so as to give the jury any light whatever on the case. To exclude them would inevitably lead to compelling jurors to 'form their decision upon such descriptions of acts and appearances as the witnesses could give—and entirely shut out the opinions of any witnesses based on their own observation.

We think there is no error in the rulings.

MARTIN CH. J. and CHRISTIANCY J. concurred.

MANNING J. did not sit in this case.

*Judgment affirmed.*